**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

LETANTIA BUSSELL,
*Defendant-Appellant.*

No. 02-50495

D.C. No.
CR-01-00056-AHS-
02

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

LETANTIA BUSSELL,
*Defendant-Appellee.*

No. 02-50528

D.C. No.
CR-01-00056-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Argued and Submitted
August 6, 2004—Pasadena, California

Filed July 12, 2005

Before: John T. Noonan, Richard R. Clifton, Circuit Judges,
and Jeremy Fogel, District Judge.*

Opinion by Judge Clifton

*The Honorable Jeremy Fogel, United States District Judge for the
Northern District of California, sitting by designation.

8077

## COUNSEL

Shirley M. Hufstedler, Los Angeles, California; and Dan Marmalefsky, Los Angeles, California, for the defendant-appellant-cross-appellee.

Ronald L. Cheng, Los Angeles, California; and Ranee A. Katzenstein, Los Angeles, California, for the plaintiff-appellee-cross-appellant.

## OPINION

CLIFTON, Circuit Judge:

Letantia and John Bussell, together with their former lawyers, were charged with omitting assets from and making false statements in their joint petition for Chapter 7 bankruptcy relief. After the jury began its deliberations following a lengthy trial, John fell to his death from his hotel room. In accordance with the district court's instruction, the jury con-

tinued deliberations with respect to Letantia and ultimately convicted her on six counts.

Letantia here appeals her convictions, her sentence, and the district court's orders of restitution and costs. As to Letantia's convictions, we discern no reversible error and accordingly, affirm. As to her sentence, which she appeals and the government cross-appeals, we remand for further proceedings pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). Finally, as to the district court's orders of restitution and costs, we reverse and remand for reconsideration consistent with this opinion.

## I.   BACKGROUND

After petitioning for and receiving Chapter 7 bankruptcy relief in 1995, the Bussells were indicted in 2000 for omitting from their joint bankruptcy petition their ownership of a four-unit condominium located in Park City, Utah, and their interests in two corporations related to Letantia's dermatology practice. The charges relevant to the present appeal include one count of conspiring to conceal assets in contemplation of bankruptcy, to make false statements in relation to the bankruptcy, and to conceal assets belonging to the bankruptcy estate; three counts of concealing assets in bankruptcy; two counts of making false statements in bankruptcy; one count of making a false oath and account; and two counts of attempting to evade tax payments.

Before trial, the Bussells moved to dismiss certain of the charges on the ground that the questions posed by the bankruptcy forms were fundamentally ambiguous. Their motion was denied.

Trial, which began on November 20, 2001, was hard-fought and lengthy. The Bussells argued at trial that they had acted in good faith and relied on the advice of their attorneys, Jeffrey Sherman and Robert Beaudry. Both Sherman and

Beaudry entered into plea agreements with the government, under which Sherman pleaded guilty to conspiracy and attempted tax evasion, and Beaudry pleaded guilty to aiding and abetting attempted tax evasion and the filing of false tax returns.

On February 5, 2002, after jury deliberations had begun, John fell to his death from his hotel room.[1] After being instructed that the case against John was no longer before them, the jury continued deliberations with respect to Letantia. Letantia was ultimately convicted of six counts (one count of conspiracy, two counts of concealment of assets, two counts of making false statements, and one count of attempted tax evasion), and acquitted of three (one count of concealment of assets, one count of making a false oath and account, and one count of attempted tax evasion).

The district court sentenced Letantia to thirty-six months in custody and ordered her to pay, in addition to a special assessment and a fine, restitution totaling $2,393,527.00, for which she was jointly and severally liable with attorneys Sherman and Beaudry, and prosecution costs totaling $62,614.37. Letantia timely appealed her conviction, her sentence, and the district court's orders of restitution and costs. The government timely cross-appealed Letantia's sentence.

## II. DISCUSSION

### A. Death of the Codefendant

After learning of John's death, the district court expressed concern that the jury was awaiting responses on two questions regarding counts against John and was likely to hear of John's death through the media. The district court accordingly pro-

---

[1]Outside the presence of the jury, the district court characterized John's death as a suicide, but Letantia argues that there is no evidence clearly establishing that John took his own life. We need not resolve the question.

posed the following version of Ninth Circuit Model Criminal Jury Instruction 2.13:

> The case against codefendant John Bussell has been disposed of and is no longer before you. Do not guess or speculate as to the reason for the disposition. The disposition should not influence your verdict with reference to the remaining defendant, and you must base your verdict solely on the evidence against the remaining defendant.

Absent objections from the government or defense counsel, the district court transmitted the supplemental instruction to the jury.

After her conviction, Letantia moved for a new trial under Federal Rule of Criminal Procedure 33, alleging that jurors had engaged in misconduct by speculating that John had pleaded guilty. She submitted the declaration of a private investigator, who had learned from interviews of four jurors that during deliberations, "jurors said to each other that perhaps they were not to consider the charges as to John Bussell because he had pleaded guilty in some sort of a plea bargain, as had lawyers Sherman and Beaudry." One of the jurors also submitted a declaration to this effect.

The district court denied the motion without an evidentiary hearing. The court deemed the declarations inadmissible under Federal Rule of Evidence 606(b), rejecting Letantia's argument that they fell within an exception which permits jurors to testify regarding extraneous information improperly brought to their attention. The court further concluded that even if the declarations were admissible, any misconduct they described was "entirely harmless, given the evidence in the case."

On appeal, Letantia argues that the district court erred in informing jurors that the case against John had been disposed

of, rather than informing them that he had died. She contends that the incomplete information invited jurors to speculate that John had pleaded guilty, as their attorneys had, and that the prejudice from their speculation "spilled over" to her. She also argues that the district court erred in denying her motion for a new trial because the submitted declarations establish that the jury in fact speculated that John had pleaded guilty.

### 1. Supplemental Jury Instruction

We review the supplemental jury instruction for plain error because Letantia raised no objection below. *See United States v. Stapleton*, 293 F.3d 1111, 1118 n.3 (9th Cir. 2002). " 'Under a plain error analysis, the court may reverse when (1) there was actual error; (2) the error was plain (i.e. 'clear' or 'obvious'); and (3) the error affected the defendant's 'substantial rights.' " *United States v. Pimentel-Flores*, 339 F.3d 959, 967 (9th Cir. 2003) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

**[1]** We have not previously addressed the dilemma presented when a codefendant dies during trial. We have, however, considered the dilemma presented when a codefendant enters a guilty plea during trial. *See United States v. Washabaugh*, 442 F.2d 1127 (9th Cir. 1971); *United States v. Jones*, 425 F.2d 1048 (9th Cir. 1970). These cases offer useful guidance.

**[2]** In *Washabaugh*, we suggested that where a guilty plea is entered late in trial by one of several closely identified defendants, the best course may be simply to tell the jury that the defendant is no longer part of the case. *See* 442 F.2d at 1129. There, a defendant changed his plea "[a]fter most of the evidence was in." *Id.* Although "all three defendants were charged with the same crime in the same count and had sought to escape conviction on the same ground," the district court informed the jury of the changed plea. *Id.* We observed that while informing the jury was not erroneous, "given the

close identification of the defendants with one another in the Dyer Act count and the lateness in the trial, it might have been better simply to tell the jury that [the defendant] was to be considered no longer a defendant in the case and that his guilt or innocence should play no part in future deliberations." *Id.*; *accord* 9th Cir. Model Crim. Jury Instr. 2.13.

**[3]** Here, as in *Washabaugh*, "close identification" between the defendants and "lateness in the trial" were pressing concerns. With the exception of a single count brought against her only, Letantia was charged with the same crimes in the same counts as John, and she asserted similar, if not identical, defenses of good faith and reliance on the advice of counsel. *Cf.* 442 F.2d at 1129. In addition, John died during jury deliberations. Under these circumstances, where news of John's death might have influenced the ongoing deliberations concerning Letantia, the district court adopted precisely what we have suggested might be the "better" approach: simply informing the jury that John was no longer a defendant in the case. *Id.*

We acknowledge, however, that Letantia's contrary position is not without support. In *Jones*, we concluded that the district court did not plainly err in informing the jury, in a "plain and nonargumentative statement," that three of the defendants were not being tried because they had changed their pleas to guilty. 425 F.2d at 1053. We observed:

> If no explanation is made to a jury of why certain defendants, originally in a criminal case, are no longer participants at the trial, the jury is full of curiosity, conjecture and surmise. Most experienced trial judges think the best, safest and fairest procedure to all is a simple and honest statement to the jury as to why codefendants are no longer such.

*Id. Jones*, then, suggests that a "simple and honest" statement that John had died may have been preferable.

**[4]** Still, we are not persuaded that the district court's decision not to provide such an explanation amounted to clear or obvious error. First, *Jones* involved guilty pleas entered early in the trial: one plea was entered before the jury was empaneled and two others were entered after the government made its opening statement. 425 F.2d at 1053. *Washabaugh* suggests that where "lateness in the trial" is a concern, the "better" approach may be simply to tell the jury that the defendant is no longer a part of the case. 442 F.2d at 1129. Second, as noted above, neither *Jones* nor *Washabaugh* involved the specific situation presented here. Finally, Letantia maintains that the supplemental instruction was erroneous because it invited jurors to speculate that John pleaded guilty. Yet *Jones* held that it was not plainly erroneous to advise the jury that a codefendant had in fact entered a guilty plea. 442 F.2d at 1053-54. It follows, then, that advising the jury in a way that might have permitted speculation regarding a guilty plea also was not plainly erroneous.

### 2. Motion for New Trial

Of course, Letantia's motion for a new trial went farther, alleging not only that the supplemental jury instruction permitted speculation, but also that jurors did in fact speculate. She maintains on appeal that the jurors' speculation constituted prejudicial extrinsic evidence. We review the district court's denial of a new trial and its decision not to hold an evidentiary hearing for abuse of discretion. *United States v. Mills*, 280 F.3d 915, 921 (9th Cir. 2002); *United States v. Saya*, 247 F.3d 929, 934, 937 (9th Cir. 2001).

**[5]** We turn at the outset to the admissibility of the submitted declarations. *See United States v. Maree*, 934 F.2d 196, 201 (9th Cir. 1991). Under Federal Rule of Evidence 606(b):

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any

other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

We do not view the jurors' speculation as "extraneous prejudicial information." Significantly, the alleged source of the speculation — the district court's supplemental instruction — was not extraneous: "It did not enter the jury room through an external, prohibited route," but rather "was part of the trial." *Compare United States v. Rodriquez*, 116 F.3d 1225, 1227 (8th Cir. 1997) (rejecting the argument that the defendant's failure to testify was extraneous information because "[i]t was part of the trial") *with United States v. Keating*, 147 F.3d 895, 903 (9th Cir. 1998) (describing the defendant's prior conviction as extrinsic evidence because it was "entirely new and inadmissible"); *see also United States v. Bagnariol*, 665 F.2d 877, 886 (9th Cir. 1981) (discussing *United States v. Bassler*, 651 F.2d 600, 602 (8th Cir. 1981), in which a juror's notes, which described only what she heard at trial, were found "intrinsic to the deliberations"). The speculation allegedly triggered by the instruction was the product of normal human curiosity, part of the "general knowledge, opinions, feelings, and bias" which we have "carefully distinguished" from "[t]he type of after-acquired information that potentially taints a jury verdict." *Hard v. Burlington N. R.R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989). Accordingly, like the district court, we conclude that the submitted declarations are inadmissible under Rule 606(b).

Moreover, even if admissible, the declarations would not warrant a new trial (or an evidentiary hearing, *see Hard*, 812 F.2d at 486) unless there was " 'a reasonable possibility that the extrinsic material could have affected the verdict.' " *Keat-*

*ing*, 147 F.3d at 900 (quoting *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir. 1988)). Although our review of the impact of extrinsic material " 'is an independent one,' " *id.* (quoting *Dickson*, 849 F.2d at 405), we " 'must accord special deference to the trial judge's impression.' " *Mills*, 280 F.3d at 921 (quoting *United States v. Hanley*, 190 F.3d 1017, 1031 (9th Cir. 1999)). As we have acknowledged, the trial judge, who "observes the jurors throughout the trial" and hears the evidence and defenses, "is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature." *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir. 1981).

Here, the district court deemed the jurors' alleged speculation harmless. We agree. As described above, we do not believe that the material " 'actually received' " by the jury was extrinsic. *Keating*, 147 F.3d at 902 (quoting *Dickson*, 849 F.2d at 406). In addition, the speculation was "ambiguously phrased" — according to the investigator's declaration, jurors said "*perhaps* they were not to consider the charges as to John Bussell because he had pleaded guilty" (emphasis added) — and the district court gave an express instruction that the disposition of the charges against John "should not influence [the] verdict with reference to the remaining defendant." *See Jeffries v. Wood*, 114 F.3d 1484, at 1491-92 (9th Cir. 1997), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997). Both facts suggest that the potential prejudice of speculation was "diminished." *Id.* at 1491. Finally, we note that with respect to the charges brought jointly against Letantia and John, the jury found Letantia guilty on certain counts, but not guilty on others, indicating that it took care to distinguish the defendants and to render an impartial verdict. *See United States v. Gaggi*, 811 F.2d 47, 53 (2d Cir. 1987). For these reasons, we conclude that the district court did not abuse its discretion in denying the motion for a new trial or in declining to hold an evidentiary hearing.

### B.    Ambiguity of the Bankruptcy Forms

Approximately two years before declaring bankruptcy, Letantia began operating her dermatology practice through three corporations: BBL Medical Management, Inc.; Beverly Hills Dermatology Medical Corp.; and L.B. Bussell, Medical, Inc. The first corporation, BBL Medical, received all of the practice's income, paid all of its expenses, and retained all of its profits. The Bussells transferred between ten and twenty percent of BBL Medical's profits through the second corporation, Beverly Hills Dermatology, to the third corporation, L.B. Bussell, which then paid Letantia an artificially reduced salary. BBL Medical and Beverly Hills Dermatology were held in the names of "nominee" shareholders and officers, described in the indictment as persons who are enlisted to serve as owners or officers of public record but have "no genuine ownership interest or actual managerial authority." L.B. Bussell, in contrast, was held in Letantia's name.

In petitioning for bankruptcy relief, the Bussells responded to a number of questions regarding their personal property and financial affairs. At issue here are question 12 of the Schedule of Personal Property, which asked them to list "[s]tock and interests in incorporated and unincorporated businesses," and question 16(a) of the Statement of Financial Affairs, which asked them to list all businesses in which they were an "officer, director, partner, or managing executive." The Bussells did not identify BBL Medical or Beverly Hills Dermatology in response to either question.

Before trial, the Bussells moved to dismiss or strike the allegations based on these questions, arguing that the terms "interests" and "managing executive" are fundamentally ambiguous. The district court denied the motion, characterizing the existence of ambiguity as "a jury question." Letantia reasserted this argument in a post-conviction motion for judgment of acquittal, but that motion was also denied.

On appeal, Letantia continues to argue that questions 12 and 16(a) are fundamentally ambiguous. From this argument, she draws several conclusions: First, because the questions are fundamentally ambiguous, her answers may not form the basis of a prosecution for false statements. *See United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003). Second, absent her answers to these questions, there was insufficient evidence to sustain her convictions on counts five and six of the indictment. Third, given the ambiguity of questions 12 and 16(a), she was entitled to jury instructions supporting her defense that the questions did not clearly call for identification of BBL Medical or Beverly Hills Dermatology. We address these conclusions in turn.

### 1.  Improper Basis for Prosecution

We have not previously defined the standard of review for the dismissal of false statement charges based on fundamental ambiguity. *Id.* at 1078. We need not do so here because we would affirm the determination of the district court even under de novo review. *See id.*

**[6]** The answer to a "fundamentally ambiguous" question "may not, as matter of law, form the basis of a prosecution for perjury or false statement." *Culliton*, 328 F.3d at 1078. But we do not invalidate a conviction "simply because the questioner and respondent might have different interpretations" of the relevant questions. *Id.* at 1079. Rather, we examine the context of the question and answers, as well as other extrinsic evidence, to determine whether the respondent provided false answers to the questions "as he understood [them]." *Id.*

**[7]** The context of question 12 indicates that Letantia understood the question and provided a response that was false in light of her understanding. As an initial matter, we note that the term "interests" appeared in several of the questions surrounding question 12. Question 9 asked for "[i]nterests in insurance policies," question 11 for "[i]nterests

in IRA, ERISA, Keogh, or other pension or profit sharing plans," and question 13 for "[i]nterests in partnerships or joint ventures." The fact that Letantia answered each of these questions accurately suggests that she understood the term.

In addition, question 33 asked for "[o]ther personal property of any kind not already listed." Accordingly, if Letantia did not understand her associations with BBL Medical and Beverly Hills Dermatology to constitute "interests" under the specific terms of question 12, she had the option to disclose them as "other personal property" under the broad terms of question 33. *See Culliton*, 328 F.3d at 1079 (rejecting a claim that questions were fundamentally ambiguous because a respondent who "might feel compelled" to provide unreasonable responses had the "option of explaining his or her answers in a separate space provided on the Form"). But she instead responded "[n]one." Her failure to identify the more profitable of the three corporations — in response to either question — belies her present contention that she made an honest but unsuccessful attempt to understand and respond to question 12.

We reach a similar conclusion with regard to question 16(a), which broadly referred to corporations in which the debtors were an "officer, director, partner, or managing executive." When the Bussells organized BBL Medical and Beverly Hills Dermatology, they approached an employee and a personal friend to serve as owners. Yet the owner and president of BBL Medical, the bookkeeper for Letantia's medical practice, served in those capacities in name only. She testified that the Bussells, not she, oversaw the corporation's operations, including managing its bank accounts, paying its expenses, and controlling its profits. The Bussells in this way played significant roles in operating BBL Medical, but nevertheless omitted it from their response to the broad inquiry posed by question 16(a).

[8] Moreover, even without regard to BBL Medical and Beverly Hills Dermatology, the Bussells failed to disclose that

Letantia was the officer of record for L.B. Bussell. That the Bussells did not disclose *any* of their corporate associations — even those which clearly fell within the scope of the question — undermines Letantia's assertion that she attempted to provide a truthful response, but failed to do so because she could not understand the term "managing executive."

### 2. Insufficient Evidence

**[9]** We also reject Letantia's claim that there was insufficient evidence to sustain her convictions on counts five and six of the indictment. Counts five and six alleged that the Bussells knowingly and fraudulently made false statements by, among other things, failing to disclose that they held interests in and were managing executives of BBL Medical and Beverly Hills Dermatology. As described above, we conclude that a rational trier of fact could have found that Letantia understood the questions concerning interests and managing executives and provided false answers to these questions as "[s]he understood [them]." *Culliton*, 328 F.3d at 1079. Because we find Letantia's responses to questions 12 and 16(a) sufficient to sustain her convictions on counts 5 and 6, we need not address her additional claim that there was insufficient evidence to support the counts' other allegations. *See Griffin v. United States*, 502 U.S. 46, 56-57 (1991) (" '[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " (quoting *Turner v. United States*, 396 U.S. 398 (1970)) (first alteration in original)).

### 3. Jury Instructions

Letantia maintains that she was entitled to several proposed jury instructions which supported her defense that she did not understand the bankruptcy forms to require disclosure of the omitted information. Specifically, her proposed instructions would have highlighted that the bankruptcy forms left certain

key terms undefined, that a corporation is distinct from its shareholders, and that a shareholder's "interest" in a corporation does not extend to its assets or income.

We review jury instructions de novo to determine whether they adequately presented the defendant's theory of the case. *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000). But because "a defendant is not entitled to any particular form" of instructions, we review their precise formulation for abuse of discretion only. *Id.* at 1230-31.

We conclude that the district court's instructions adequately presented Letantia's defense that she interpreted the bankruptcy forms in good faith. In its lengthy instruction on the subject, the district court informed the jury that good faith was a "complete defense to each of [the bankruptcy-related] charges. The court explained that a person who acted in good faith — that is, based "on a belief or opinion honestly held" — was "not punishable under these statutes merely because the belief or opinion turn[ed] out to be inaccurate, incorrect, or wrong." Criminal punishment was instead reserved for "those people who knowingly defraud or attempt to defraud."

Given these statements, which adequately presented Letantia's good-faith defense, we cannot say that the district court abused its discretion in rejecting the additional instructions. *See United States v. Sarno*, 73 F.3d 1470, 1485 (9th Cir. 1995). Although, as Letantia urges, the additional instructions might have supported the honesty of her beliefs, "[a] defendant may not draw upon the right to present a 'theory of the case' to compel a certain resolution to a disputed question of fact." *United States v. Sarno*, 73 F.3d 1470, 1485 (9th Cir. 1995); *accord United States v. Felix-Gutierrez*, 940 F.2d 1200, 1211 (9th Cir. 1991).

## C. Prior Bad Acts of Bankruptcy Counsel

In a declaration made shortly after he entered into his plea agreement, the Bussells' former lawyer, Robert Beaudry,

stated that he and Jeffrey Sherman had advised not only the Bussells, but also three other clients in "implement[ing] essentially this same structure . . . in furtherance of similar bankruptcy and tax fraud schemes." The Bussells argued before the district court that testimony regarding these prior bad acts would establish that Beaudry and Sherman assured other clients that their fraudulent schemes were entirely legal, buttressing the Bussells' defense that Beaudry and Sherman provided them with similar assurances. In support of their motion, they submitted the declaration of John's defense lawyer, who had interviewed two of Beaudry's former clients and discovered that they believed his work to be "100% legitimate" and completely "above board." Beaudry's defense lawyer, however, revealed that Beaudry had performed acts for these clients "which could conceivably be the basis of impeachment . . . under Rule 608(b) of the Federal Rules of Evidence."

The district court granted the government's pre-trial motion to exclude the proffered testimony, finding in part that its probative value was substantially outweighed by the dangers of confusing the issues and delaying the trial. *See* Fed. R. Evid. 403. The district court reasoned that the testimony would indicate the alleged pattern only if Beaudry's other clients were in fact "innocent dupes." Yet determining the clients' innocence would require a potentially confusing and time-consuming "trial within a trial."

Letantia contends on appeal that no such trial was necessary because she intended to show only that Beaudry and Sherman had a pattern of advising clients that their advice was legal. This showing, she maintains, would have required only brief testimony by Beaudry's former clients.

We review the evidentiary ruling for abuse of discretion, according " 'considerable deference' " to the district court's determination under Rule 403. *United States v. Hankey*, 203 F.3d 1160, 1166-67 (9th Cir. 2000) (quoting *United States v.*

*Cordoba*, 194 F.3d 1053 (9th Cir. 1999)). Further, because the alleged error is nonconstitutional, an abuse of discretion would warrant reversal only if it " 'more likely than not affected the verdict.' " *Id.* at 1167 (quoting *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir. 1999)).

**[10]** Mindful that " '[t]he Rule 403 weighing process . . . is primarily for the district court to perform,' " we conclude that the district court did not abuse its discretion. *See Cordoba*, 194 F.3d at 1063 (quoting *United States v. Layton*, 767 F.2d 549, 553 (9th Cir. 1985)). Though defense counsel might have limited the testimony to the advice received by Beaudry's former clients, their knowledge (or lack thereof) would nevertheless have remained relevant. Indeed, even limited testimony by Beaudry's former clients would have prompted rebuttal by the government intended to establish that the clients were willing coconspirators rather than "innocent dupes." If the government succeeded, the pattern established by the testimony would have bolstered not the defense's theory, but the government's — that is, that Sherman and Beaudry had a practice of conspiring with clients in executing fraudulent bankruptcy and tax schemes. For these reasons, we cannot say that the district court abused its discretion in determining that a trial within a trial would be required, or that a trial regarding unrelated clients involved in unrelated schemes posed a potential for confusion and delay that substantially outweighed the probative value of the evidence.

Moreover, even if the district court had abused its discretion, its error would not warrant reversal. Significantly, although defense counsel were not permitted to introduce extrinsic evidence of the alleged prior acts, they were permitted to reference the acts during cross-examination. In response to such questioning, Beaudry admitted that he had structured fraudulent schemes for "four, five, six and maybe more" clients, but told only "one or two" that the schemes were illegal:

Q:   And the others you didn't?

A:   That's correct.

Through cross-examination, then, defense counsel established the precise pattern of misleading advice that the Bussells sought to establish through extrinsic evidence. Accordingly, we are not persuaded that exclusion of the extrinsic evidence more likely than not affected the verdict.

Evidence that jurors stated that they "wished [they] had heard testimony . . . from prior clients" does not change our conclusion. Rather, such evidence is, as described above, inadmissible under Rule 606(b) as testimony regarding "statement[s] occurring during the course of the jury's deliberations." Fed. R. Evid. 606(b).

## D.   Sentencing

Following her conviction, Letantia was sentenced to thirty-six months in custody (comprising six concurrent terms — one for each count of conviction — of thirty-six months each) and three years of supervised release. Both the government and Letantia assert errors in sentencing. For one, Letantia maintains that the application of enhancements under the Sentencing Guidelines was inconsistent with the Sixth Amendment because they were imposed under then-mandatory guidelines on the basis of facts neither admitted by her nor proved to a jury beyond a reasonable doubt. *See United States v. Booker*, 125 S. Ct. 738, 756-57 (2005).

**[11]** Because Letantia did not raise a Sixth Amendment objection below, we review the district court's application of the Sentencing Guidelines for plain error. *See Booker*, 126 S. Ct. at 769. Our review leads us to the same "dead end" reached in *Ameline*: "[I]t is not possible to reliably determine from the record whether the sentence imposed would have been materially different had the district court known that the

Guidelines were advisory . . . ." *Id.* at 1084. We accordingly remand to the district court to answer that question and to proceed accordingly pursuant to *Ameline*.

E.   Restitution and Costs

Letantia was also ordered to pay, in addition to a special assessment and a fine, restitution totaling $2,393,527.00, for which she was jointly and severally liable with attorneys Sherman and Beaudry, and prosecution costs totaling $62,614.37. Letantia maintains that the district court erred with respect to both orders. She notes that the district court ordered restitution in an amount that, aside from an adjustment for a settled debt, was equal to intended, rather than actual, loss. *See* 18 U.S.C. § 3663. In addition, the district court ordered her to pay the costs of prosecution in their entirety, without regard to whether they were reasonable and necessary to prosecuting the counts on which she was convicted. *See* 26 U.S.C. § 7201.

In contrast to its application of the Sentencing Guidelines, the district court's orders of restitution and costs are unaffected by the changes worked by *Booker*. *See United States v. DeGeorge*, 380 F.3d 1203, 1221 (9th Cir. 2004); *cf. United States v. Chavez*, 627 F.2d 953, 957 (9th Cir. 1980) ("The presence of the mandatory costs of prosecution provision [in 26 U.S.C. § 7203] does not, with any degree of certainty, substantially increase the threatened punishment."). We review the legality of the orders de novo. *See United States v. Gordon*, 393 F.3d 1044, 1051 (9th Cir. 2004); *United States v. Fowler*, 794 F.2d 1446, 1449 (9th Cir. 1986).

**[12]** Under the Victim and Witness Protection Act, the statute that governs orders of restitution for offenses committed prior to 1996, a district court's authority to order restitution is subject to several conditions. *United States v. Woodley*, 9 F.3d 774, 780 (9th Cir. 1993). Among these is the requirement that the amount of restitution be "limited by the victim's

*actual* losses." *Id.* The district court, however, ordered restitution in an amount that, but for an adjustment for a settled debt, was equal to the amount of *intended* losses. We therefore vacate the order of restitution and remand to the district court to determine the actual losses caused by Letantia's fraudulent conduct — that is, to compare "what actually happened with what would have happened if [she] had acted lawfully." *See United States v. Feldman*, 338 F.3d 212, 220-21 (3d Cir. 2003).

**[13]** We must also vacate and remand the order imposing the costs of prosecution. Under 26 U.S.C. § 7201, "[t]he government may only recover costs associated with a successful prosecution." *Cf. Fowler*, 794 F.2d at 1449 (interpreting the analogous costs provision of 26 U.S.C. § 7206). As such, the government cannot assess against a defendant costs associated exclusively with the counts on which he was acquitted. *Cf. id.* Because the district court declined to allocate costs among counts (opting instead to assess them in their entirety), we cannot be certain that it excluded any costs associated exclusively with the counts on which Letantia was acquitted. We accordingly vacate and remand the order with instructions to exclude any such costs.

## III.   CONCLUSION

For the foregoing reasons, we affirm as to Letantia's convictions. As to her sentence, however, we remand pursuant to *Ameline*. Finally, as to the district court's orders of restitution and costs, we vacate and remand for reconsideration.

**AFFIRMED IN PART, VACATED IN PART, and REMANDED.**