# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

LETANTIA BUSSELL,
            *Defendant-Appellant.*

No. 06-50088

D.C. No.
CR-01-00056-AHS-
02

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

LETANTIA BUSSELL,
            *Defendant-Appellant.*

No. 06-50140

D.C. No.
CR-01-00056-AHS-
01

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Argued and Submitted
February 6, 2007—Pasadena, California

Filed September 27, 2007

Before: Diarmuid F. O'Scannlain, Edward Leavy, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge O'Scannlain

13265

**COUNSEL**

Dan Marmalesfsky, Morrison & Foerster LLP, Los Angeles, California, argued the cause for the defendant-appellant, and filed briefs; Heather Pearson, Morrison & Foerster LLP, Los Angeles, California, was on the briefs.

Paul Stern, Assistant U.S. Attorney, Major Frauds Section, Los Angeles, California, argued the cause for the plaintiff-appellant, and filed a brief; Debra Wong Yang, U.S. Attorney, Thomas P. O'Brien, Assistant U.S. Attorney, Chief, Criminal Division, and Ranee A. Katzenstein, Assistant U.S. Attorney, Major Frauds Section, were on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We are asked to decide whether the district court properly determined the amount of intended loss for purposes of sentencing, and the amount of actual loss for purposes of restitution, resulting from convictions for bankruptcy fraud.

## I

Letantia Bussell ("Letantia") is a practicing dermatologist.[1] Her late husband, John Bussell, was a practicing cardiac anaesthesiologist until 1992. In 1992, the Bussells were experiencing significant financial difficulties. They owed the Internal Revenue Service ("IRS") and the California State Franchise Tax Board approximately $1.2 million in taxes, interests, and penalties assessed for tax years 1983, 1984, 1986, and 1987. They also owed the Bank of Beverly Hills $787,500.00.

Upon the advice of their former lawyers, the Bussells organized the dermatology practice into a three-tiered structure in 1992. The new arrangement separated the business and medical aspects of Bussells's practice: BBL Medical Management, Inc. ("BBL") received the practice's gross receipts, paid the expenses and overhead, and retained the profits; Beverly Hills Dermatology Medical Corp. ("Beverly Hills Medical") received 10% to 20% of BBL's profits and employed Letantia through her professional corporation, L.B. Bussell, MD, Inc. ("L.B. Bussell, Inc."), for an artificially reduced salary. BBL and Beverly Hills Medical were held in the names of nominee owners; Letantia was the sole shareholder and officer of public record of L.B. Bussell, Inc. The Bussells further enlisted the help of their former lawyers in 1993 to set up various corporations to conceal ownership of a four-unit condominium in the Stein-Ericksen Lodge in Park City, Utah (the "Utah condominium"), a San Diego farm, and receipt of disability insurance income. The Bussells also opened an off-shore bank account to receive funds from John Bussell's pension plan.

On March 7, 1995, the Bussells, together with their former lawyers, filed a joint bankruptcy petition. The Bussells

---

[1]As the facts are set out at length in our prior opinion in Letantia's first appeal, we will only briefly discuss the relevant facts here. *See United States v. Bussell* (*Bussell I*), 414 F.3d 1048 (9th Cir. 2005).

reported total assets of $1,783,026.30 and total debts of $4,677,194.22 on that petition. The amount of debt scheduled for discharge totaled $3,057,927.09, but the bankruptcy court only discharged debt of $2,293,527.09 because a liability of $764,000.00 to Provident was at issue in pending litigation.

Following the bankruptcy discharge, Letantia was charged in a 17-count indictment, along with two co-defendants, with conspiracy, concealment of assets in contemplation of bankruptcy, making false declarations, perjury, and attempted tax evasion. At trial, the Bussells argued that they had acted in good faith and relied on the advice of their lawyers. *Bussell I*, 414 F.3d at 1052. After jury deliberations had begun, John Bussell fell to his death from his hotel room. *Id.*

The jury ultimately convicted Letantia of the following counts charged in the indictment: conspiracy to conceal assets in contemplation of bankruptcy and to make false statements in the bankruptcy (count 1); concealing ownership in BBL, including BBL's bank account with a balance of $949,048.00 (count 2); concealing ownership in Beverly Hills Medical, including Beverly Hills Medical's bank account with a balance of $5,787.00 (count 3); making false statements in the bankruptcy petition (counts 5 and 6); and willfully attempting to evade a substantial portion of income tax owed for tax years 1983, 1984, 1986, and 1987 (count 12). The jury, however, acquitted Letantia of concealing ownership of the Utah condominium (count 4); making a false oath and account that she was not actively involved with any corporations other than L.B. Bussell, Inc. except on a passive investment basis (count 11); and willfully attempting to evade a substantial portion of income tax owed for 1996 (count 17).

Their former lawyers, Sherman and Beaudry, entered into plea agreements with the government, under which Sherman pleaded guilty to conspiracy and to attempted tax evasion, and Beaudry pleaded guilty to aiding and abetting attempted tax evasion and the filing of false tax returns. *Id.*

Applying the then-mandatory Sentencing Guidelines, the district court sentenced Letantia to a mid-range sentence of 36 months imprisonment. In determining her offense level for purposes of calculating an appropriate Guidelines range, the district court increased the base offense level by 13 levels, finding that the intended loss equaled $3,057,927.09, the amount of debt scheduled for discharge in bankruptcy. The district court also ordered Letantia to pay, in addition to a special assessment and a fine, restitution totaling $2,393,527.00, for which she was jointly and severally liable with attorneys Sherman and Beaudry, and prosecution costs totaling $62,614.37.

Letantia timely appealed her conviction, her sentence, and the district court's orders of restitution and costs. The government timely cross-appealed Letantia's sentence. In *Bussell I*, we affirmed Letantia's conviction, but ordered a limited remand pursuant to *Ameline*. *Bussell I*, 414 F.3d at 1060. We also vacated the district court's orders of restitution and prosecution costs, and remanded for reconsideration. *Id.*

On remand, the district court declined to reopen sentencing proceedings, concluding that Letantia's sentence would not have materially differed had the Guidelines been advisory at the time of the original sentencing. The district court also ordered restitution of $2,284,172.87, costs of prosecution of $55,626.09, and a criminal fine of $50,000.00.

Letantia timely appealed.

## II

We first consider Letantia's various challenges to her sentence.[2]

---

[2]"Commentary to the Guidelines binds us in interpreting their provisions unless it violates the Constitution or a federal statute, or is inconsistent with the Guidelines." *United States v. Asberry*, 394 F.3d 712, 716 n.5 (9th Cir. 2005).

A

**[1]** The Sentencing Guidelines assign a base offense level of six, *see* U.S.S.G. § 2F1.1(a) (1994),[3] and then increase levels according to the amount of loss resulting from the fraud, *see* U.S.S.G. § 2F1.1(b)(1).[4] The accompanying application notes define "loss" as "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1 cmt. n.7. The application notes further provide that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1 cmt. n.7. In some cases, "additional factors are to be considered in determining the loss or intended loss." U.S.S.G. § 2F1.1 cmt. n.7 The commentary also explains that "*the loss need not be determined with precision*. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 cmt. n.8 (emphasis added).

The thrust of Letantia's argument is that intended loss should be categorically limited to the value of the concealed assets or the value of her liabilities, whichever is less. She contends that the district court erred by determining her intended loss based on the amount of debt discharged in bank-

---

[3]To avoid ex post facto infractions, the district court applied the 1994 Guidelines. *See United States v. Williamson*, 439 F.3d 1125, 1137 n.14 (9th Cir. 2006) ("The district court must apply the Guidelines in effect when the defendant is sentenced, unless doing so creates ex post facto issues."). We therefore refer to the November 1, 1994, edition throughout this opinion.

[4]We review de novo the district court's interpretation of the Sentencing Guidelines. *United States v. Stoddard*, 150 F.3d 1140, 1145 (9th Cir. 1998). The meaning of "loss" under the Sentencing Guidelines is a question of law reviewed de novo. *Id.* We review for clear error the district court's factual findings, including the calculation of loss to the victims. *United States v. W. Coast Aluminum Heat Treating Co*., 265 F.3d 986, 990 (9th Cir. 2001).

ruptcy, $3,057,927.09, rather than by the allegedly much lower net value of the concealed assets, $85,000.00.[5]

[2] This argument appears at first glance to find support in Eighth Circuit precedents. In *United States v. Dolan*, 120 F.3d 856 (8th Cir. 1997), the defendant committed bankruptcy fraud by concealing assets well in *excess* of the debt to be discharged. *Id.* at 862, 870-71. Under those circumstances, the Eighth Circuit concluded that the intended loss should be calculated "by using either the value of the assets concealed or the value of the debtor's liabilities, whichever is less." *Id.* at 870. In contrast to the facts in *Dolan*, in *United States v. Wheeldon*, 313 F.3d 1070 (8th Cir. 2002), the defendant filed for bankruptcy, concealing assets worth much *less* than the debt scheduled to be discharged. *Id.* at 1072. The Eighth Circuit stated in *Wheeldon* that "[i]t belies reality to argue that [the defendant], or a debtor similarly situated, intended to defraud his creditors of everything he owed them solely because he failed to disclose all of his (rather modest) assets." *Id.* at 1073. Accordingly, the Eighth Circuit held that intended loss must be limited to the value of the concealed assets that the defendant's creditors would have known about if the bankruptcy petition had been truthful. *Id.*

[3] Letantia relies on these Eighth Circuit decisions to argue that we should fashion a categorical rule for purposes of sentencing in bankruptcy fraud cases. We decline such invitation. First, in *United States v. Holthaus*, 486 F.3d 451 (8th Cir. 2007), an opinion filed after oral argument in this case, the Eighth Circuit rejected a similar mischaracterization of *Dolan* and *Wheeldon*. *Id.* at 455. There, the Eighth Circuit expressly held: "There is no blanket rule defining intended loss as the lesser of the value of assets concealed or the value

---

[5]Letantia arrives at this amount by totaling the funds concealed in the BBL Sanwa account ($949,048.00), and the BH Medical account ($5787.00), and subtracting unpaid taxes, interests, administrative expenses, and other possible exemptions.

of the debtor's liabilities. Indeed, some factual scenarios may require an intended loss calculation based on the greater of the value of the assets concealed or debt sought to be discharged." *Id.* "When determining intended loss," the Eighth Circuit emphasized, the focus must be on "the amount of loss a defendant actually intended to cause his creditors." *Id.*

Our decision in *United States v. Stoddard*, 150 F.3d 1140, counsels as well against adopting a broad categorical limitation on intended loss. There, we advised sentencing courts against "mechanically apply[ing]" the Sentencing Guidelines "in calculating loss in fraud cases." *Id.* at 1146 (alteration in original). Instead, we urged sentencing courts "to take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss." *Id.* (internal quotation marks omitted). "[T]he objective under the economic reality approach is to arrive at a fair assessment of the loss the defendant actually inflicted or intended to inflict, as contemplated by the guidelines." *United States v. Riley*, 143 F.3d 1289, 1292 (9th Cir. 1998).

[4] In light of our precedent, as well as the Eighth Circuit's recent decision in *Holthaus*, we decline to impose a mechanical limitation on intended loss as Letantia urges.[6] We will not tie the sentencing court's hands with such limitation because we do not believe it would reflect the economic reality in every bankruptcy fraud case. In the run-of-the-mill cases where the debtor acts alone and his fraudulent activities consist solely of failing to disclose a concealed asset on the bankruptcy petition, limiting intended loss to either the value of

---

[6]The Third, Fifth, and Seventh Circuits have also declined to adopt such a categorical limitation on intended loss. *See, e.g.*, *United States v. Feldman*, 338 F.3d 212, 215-16 (3d Cir. 2003); *United States v. Saacks*, 131 F.3d 540, 542 (5th Cir. 1997); *United States v. Mutuc*, 349 F.3d 930, 936-37 (7th Cir. 2003); *United States v. Holland*, 160 F.3d 377, 380-81 (7th Cir. 1998).

the concealed assets or the debt discharged, whichever is less, may well reflect economic realities. But in cases like the one at bar, where a debtor, together with other co-conspirators, engages in a lengthy, orchestrated scheme to defraud creditors by filing a fraudulent bankruptcy petition, limiting the loss to concealed assets or income will not always reflect economic realities. Accordingly, declining to adopt a categorical rule, we are unpersuaded that the district court erred by not limiting intended loss in the complex bankruptcy fraud case to the value of the concealed assets.

## B

Having concluded that the district court's legal interpretation of the Sentencing Guidelines was correct, we now must consider Letantia's argument that the district court clearly erred in its factual determination that the intended loss equaled $3,057,927.09, the amount of debt scheduled to be discharged in the bankruptcy.[7] "To be clearly erroneous," we have often repeated, "a decision must strike us more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Hayes v. Woodford*, 301 F.3d 1054, 1067 n.8 (9th Cir. 2002) (internal quotation marks omitted). No such stench lingers here.

[5] When determining intended loss, we must look to the amount of loss that Letantia intended to cause her creditors. Among other things, Letantia was convicted of conspiring[8]

---

[7]Because we reject Letantia's claim that the district court was required to limit intended loss to the value of concealed assets in this case, we need not reach her subsequent arguments in that line of reasoning, including her argument that the district court erred by not determining the *subjective* value she placed on those assets.

[8]Under U.S.S.G. § 1B1.3(a)(1)(B), the relevant conduct for a conspiracy consists of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." "In determining relevant conduct for sentencing purposes in a fraud case, a district court may

with her husband and former lawyers from about June 1992 until February 1996, with the purpose of discharging her "outstanding debts including a substantial federal tax debt, through filing bankruptcy . . . while maintaining control over and access to (1) property concealed and transferred in the preceding two years in contemplation of bankruptcy, and (2) property of the bankruptcy estate, by means of fraud, concealment and misrepresentation." The evidence establishes, and Letantia admits in her briefs, that she began experiencing significant financial difficulties in 1992, and owed the IRS and the California State Franchise Tax Board in excess of $1.2 million, and the FDIC, as the receiver for the Bank of Beverly Hills, $787,500.00, as well as other substantial debts. The evidence also establishes that over the next several years Letantia engaged her former lawyers to create a number of corporations in the name of nominee owners for the purposes of re-routing the profits from her medical practice, thereby giving the appearance that she owned less assets and earned less income, and moving various real estate holdings and disability payments to other corporations and an off-shore bank account in the name of nominee owners. On March 7, 1995, after the required period had elapsed to discharge the debt for tax deficiencies, Letantia and John Bussell, together with their former lawyers, filed for bankruptcy seeking to discharge debt in the amount of $4,677,194.22. In light of all the facts and circumstances, it cannot be said that the district court clearly erred in finding that Letantia engaged in the conspiracy over four years with the intent fraudulently to inflict a loss on her creditors equal to the debts scheduled for discharge in bankruptcy. *See Holland*, 160 F.3d at 380-81. The strength of this

---

consider fraudulent conduct by the defendant other than that for which evidence was offered at trial." *United States v. Munoz*, 233 F.3d 1117, 1126 (9th Cir. 2000). "The district court is entitled to take into account all relevant conduct, charged and uncharged, provided that the relevant conduct findings are supported by sufficient evidence. The caselaw is clear on this point." *Id.* at 1127.

evidence belies Letantia's claim that she only intended a loss of $85,000.00 to her creditors. *See Saacks*, 131 F.3d at 543.

C

We have one final sentencing matter to address. Letantia alternatively argues that, because the government stipulated in a plea agreement with co-conspirator Sherman that the highest offense level was determined by using the Sentencing Guidelines relating to tax offenses, the government now should be judicially estopped from arguing that the same conspiracy involved a much greater loss for purposes of determining her intended loss. We are unpersuaded by this argument.

**[6]** First, judicial estoppel "is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). The government has made no such contradictory factual assertions in this case. The government simply stipulated in Sherman's plea agreement to apply U.S.S.G. §§ 2T1.1 and 2T4.1, which govern offenses involving taxation, rather than U.S.S.G. § 2F1.1, which governs offenses involving fraud which would otherwise apply in Letantia's case. The government was free to stipulate with Sherman in a separate case involving different charges which Sentencing Guidelines provisions would apply to Sherman.

Moreover, we held in *United States v. Taylor*, 991 F.2d 533 (9th Cir. 1991), "that a disparity in sentencing among co-defendants is not, by itself, a sufficient ground for attacking an otherwise proper sentence under the guidelines. Rather, a defendant can only challenge his sentence by showing that it was the result of incorrect or inadmissible information, or an incorrect application of the Sentencing Guidelines." *Id.* at 536 (citation and internal quotation marks omitted).

**[7]** We therefore reject as unpersuasive Letantia's final challenge to the district court's determination of intended loss

based on principles of judicial estoppel. Because the district court's determination of intended loss was not erroneous, we affirm Letantia's sentence.

### III

We next consider Letantia's argument that the district court's restitution order of $2,284,172.87, the amount of debt actually discharged minus payments by her co-conspirator, was excessive.[9]

[8] In its first restitution order, the district court ordered Bussell, jointly and severally with co-conspirators Beaudry and Sherman, to pay restitution in the amount of $2,393,527.00, which consisted of the debt actually discharged in the bankruptcy proceedings, $2,293,527.09,[10] plus $100,000.00 that John Bussell had agreed to pay in the settlement of related litigation in 2002. In *Bussell I*, we held that the amount of restitution under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663(a), which applies to this case, is "limited by the victim's *actual* loss." *Bussell I*, 414 F.3d at 1061 (internal quotation marks omitted). Concluding that the district court "ordered restitution in an amount that, but for an adjustment for a settled debt, was equal to the amount of *intended* losses," we "vacate[d] the order of restitution and remand[ed] to the district court to determine the

---

[9]We review de novo the district court's valuation methodology. *See United States v. Lomow*, 266 F.3d 1013, 1020 (9th Cir. 2001). We also review de novo the legality of a restitution award, but if the order is within the statutory bounds, we review the amount for abuse of discretion. *See United States v. Phillips*, 367 F.3d 846, 854 (9th Cir. 2004); *see also United States v. DeGeorge*, 380 F.3d 1203, 1221 (9th Cir. 2004). A district court's factual findings supporting a restitution order, however, are reviewed for clear error. *See United States v. Hackett*, 311 F.3d 989, 991 (9th Cir. 2002).

[10]This amount represents the debts schedule for discharge of $3,057,927.09, less $764,400.00 debt to Provident, which was not discharged due to a pending adversary proceeding.

actual losses caused by Letantia's fraudulent conduct—that is, to compare 'what actually happened with what would have happened if [she] had acted lawfully.' " *Id.* (third alteration in original) (quoting *Feldman*, 338 F.3d at 220-21).

Following remand, the district court ordered Letantia to pay restitution in the amount of $2,284,172.87, which consisted of the debt actually discharged in the bankruptcy proceedings, $2,293,527.09, minus the amount co-conspirator Sherman had already paid, $9,354.22.

## A

Letantia first attacks the restitution order on the ground that the district court failed to apply the proper analysis on remand, as instructed in *Bussell I*. We disagree.

Under the VWPA, the district court may order restitution for criminal offenses committed prior to 1996. *Bussell I*, 414 F.3d at 1061. In considering restitution, the district court must take into account: "(I) the amount of the loss sustained by each victim as a result of the offense; and (II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i). We emphasized in *Bussell I* that the amount of restitution under the VWPA is limited to the victim's *actual losses*. 414 F.3d at 1061.

**[9]** Because "[r]estitution can only include losses directly resulting from a defendant's offense," "a restitution order must be based on losses directly resulting from the defendant's criminal conduct." *Stoddard*, 150 F.3d at 1147 (citations and internal quotation marks omitted). As we also explained in *Bussell I*, actual loss for restitution purposes is determined by comparing " 'what actually happened with what would have happened if [the defendant] had acted lawfully.' " 414 F.3d at 1061 (quoting *Feldman*, 338 F.3d at 220-

21). Actual loss in this case equals the excess, if any, of (1) the loss the bankruptcy creditors incurred because of the unlawful conduct, over (2) the loss the creditors would have incurred had Letantia acted lawfully.

The district court concluded on remand that had Letantia acted lawfully by not engaging in a conspiracy to conceal substantial assets and income leading up to the filing of the bankruptcy petition, and had she made full and complete disclosure of her financial affairs at the time of filing the bankruptcy petition, she would *not* have had $2,293,527.09 of debt discharged in bankruptcy. Accordingly, the district court concluded that the actual loss equaled that amount. This conclusion was obviously grounded in the district court's adoption of the 2002 presentence report's ("PSR") factual finding that the value of Letantia's concealed assets exceeded the debt scheduled to be discharged.

The PSR calculated Letantia's assets and debts as of March 7, 1995, when she filed for bankruptcy. The PSR listed concealed assets as:

> [the Bussells'] interests in BBL and Beverly Hills Medical or the Sanwa Bank account, the true amount of J. Bussell's disability income, consulting fees, and rental income, the true market value of their interest in the Stein Eriksen condominium, and their interest in UHL and Magnum. The Bussells did not list any ownership interest in two parcels of farm land in San Diego and a Palm Springs condominium.

The PSR then valued the concealed assets at between $2,849,835.00 and $3,356,835.00.[11] In their bankruptcy peti-

---

[11]Though Letantia objected to the PSR's valuation of her assets, the district court overruled the objection except in relation to the debts not discharged in bankruptcy, which do not affect the value of the concealed assets.

tion, the Bussells reported the total value of their assets to be $1,783,026.30. Combining the concealed and reported assets, the PSR concluded, and the district court accepted, that "[a]t the time they filed their bankruptcy petition, the combined value of all of the Bussells' assets exceeded their total debt."

We are persuaded that the district court adequately stated and explained its resolution of the disputed issue as to the value of the concealed assets pursuant to Fed. R. Crim. P. 32 and thereby adopted the factual findings provided in the PSR. *See United States v. Karterman*, 60 F.3d 576, 583 (9th Cir. 1995); *see also United States v. Cannizzaro*, 871 F.2d 809, 811 (9th Cir. 1989). In its tentative ruling at the initial sentencing, the district court rejected Letantia's objections to the PSR's calculation of her assets, finding that "[t]he PSR recites the evidence and other factual matters substantially accurately." In its tentative ruling on post-remand proceedings, the district court found that "[h]ere, the government has demonstrated by a preponderance of the evidence that the defendant caused actual loss in the amount of $2,293,257.09 as a result of her conspiracy conviction in Count One. Had the defendant acted lawfully, she would not have conspired in three years of pre-bankruptcy tax planning so that she and her spouse could conceal substantial income and assets to obtain a fraudulent discharge of their debts." Moreover, at oral argument on post-remand proceedings, the district court declined defense counsel's offer to examine the alleged value of the concealed assets, concluding that "the papers are fairly—very clear about what are the fees to account even if you add in the condo in Palm Springs and Farms and all the rest" and that "the various possible formulae are included in the papers."

**[10]** In light of the district court's adoption of the factual findings in the PSR, we are unpersuaded that the district court clearly erred in finding that the value of the assets exceeded the debts to be discharged and therefore the actual loss to the creditors equaled the amount of debt actually discharged in

the bankruptcy. Letantia's arguments to the contrary are without merit.

## B

Letantia argues that the district court erred by not limiting the actual loss to the amount concealed in two bank accounts in the name of BBL and Beverly Hills Medical, two companies held in the name of nominee owners. Letantia was charged with and convicted for conspiring to conceal three specific assets: (1) her "beneficial ownership interest" in BBL, including BBL's bank account with a balance of $949,048.00; (2) her "beneficial ownership interest" in Beverly Hills Medical, including Beverly Hills Medical's bank account with a balance of $5,787.00; and (3) her equity interest in the Utah condominium. She was also charged and convicted of the substantive offense of concealing her "beneficial ownership interest" in BBL and Beverly Hills Medical, but she was acquitted of the substantive offense of concealing her equity interest in the Utah condominium. Letantia contends that the district court erred by considering concealed assets beyond the two assets in which she was indicted and convicted of concealing.

Letantia relies on *Hughey v. United States*, 495 U.S. 411 (1990), where the Supreme Court interpreted the VWPA and reversed an order that required the defendant to pay restitution for counts other than the counts of conviction. The Court held that "the language and structure of the Act make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id.* at 420. But that decision is of no avail to Letantia because, after *Hughey* was decided, Congress amended the VWPA by expanding the definition of "victim," in part to overrule that decision.[12]

---

[12]Letantia's reliance on the Seventh Circuit's decision in *United States v. Kane*, 944 F.2d 1406 (7th Cir. 1991), is similarly misplaced because the acts in that case occurred well before the effective date of this amendment to the VWPA. *See United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997).

**[11]** Section 3663(a)(2) of the VWPA now provides that "[f]or purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means *any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern*." 18 U.S.C. § 3663(a)(2) (emphasis added). As we have explained, "[u]nder the amended statute, when someone is convicted of a crime that includes a scheme, conspiracy, or pattern of criminal activity *as an element* of the offense, the court can order restitution for losses resulting from any conduct that was part of the scheme, conspiracy, or pattern of criminal activity. For instance, if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction." *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996).

**[12]** Accordingly, because Letantia was convicted of a crime that included a conspiracy "as an element of the offense," the district court did not err in considering all of the concealed assets for purposes of determining the actual loss to the bankruptcy creditors.[13]

## C

**[13]** Letantia next contends that the district court erred by ordering any restitution because the IRS was the only creditor that would have received funds from the two concealed bank accounts with a purported net value of $85,000.00, and the IRS had since collected the full amount of the debt it was owed from forfeiture proceedings. We find this argument

---

[13]Because we conclude that the district court did not err in considering concealed assets other than the two bank accounts, we reject Letantia's argument that the amount of restitution should not exceed $85,000.00, the purported net value of those bank accounts to the creditors after deducting taxes, administrative expenses, and various exemptions. *See supra* note 5.

without merit. For one thing, because this case involved conspiracy, the district court was not limited under the VWPA to considering only the value of the two concealed bank accounts, as discussed above. Moreover, the record establishes that at the time of Letantia's sentencing, she was still contesting the IRS's right to maintain possession of these collected proceeds in U.S. Tax Court proceedings. Because the IRS's right to these funds was still subject to litigation at the time of sentencing, Letantia's argument that the district court erred in ordering any restitution fails.[14]

D

In sum, we are not persuaded that the district court clearly erred in finding that, had Letantia acted lawfully, the value of the assets exceeded the debts to be discharged and therefore the actual loss to the creditors equaled the amount of debt actually discharged in the bankruptcy.[15]

---

[14]We are equally unpersuaded, however, by the government's argument that Letantia is entitled to no credit toward restitution for the forfeited assets when the dispute is resolved. Most importantly, the district court's restitution order expressly provides that "[a]ny compensation that a victim receives from other sources, *including forfeited funds and funds resulting from foreclosure on any relevant IRS liens*, shall be counted toward satisfaction of the amount owed in restitution." (emphasis added.) And the government failed to cross appeal that restitution order. Moreover, the government's reliance on *United States v. Bright*, 353 F.3d 1114 (9th Cir. 2004), for the contrary proposition is misplaced, as that case involved the Mandatory Victim and Witness Protection Act of 1996, which the government recognizes is inapplicable in this case. *See United States v. Doe*, 374 F.3d 851, 856 (9th Cir. 2004). The government cites no other authority in opposition.

[15]Letantia requested that we take judicial notices of the Criminal Minutes, Tentative Ruling on Sentencing, and Judgment and Probation Order in the court proceedings of co-conspirator Beaudry. We grant the request for judicial notice. *See Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). We, however, reject Letantia's related argument that the district court erred in not ordering co-conspirator Beaudry to pay restitution pursuant to the Mandatory Victim and Restitution Act, 18 U.S.C. § 3663A, since that section does not apply to Title 26 offenses, which were the sole offenses to which Beaudry pleaded guilty. *See* 18 U.S.C. § 3663A(a)(1), (c)(1).

IV

We next consider Letantia's argument that the district court erred by awarding prosecution costs in the amount of $55,626.09.

In count 12 of the indictment, Letantia was charged with willfully attempting to evade the payment of income tax for the tax years 1983, 1984, 1986, and 1987, in violation of 26 U.S.C. § 7201.[16] Initially, the government requested prosecution costs in the amount of $62,614.37, pursuant to 26 U.S.C. § 7201. The district court declined to allocate costs among counts, opting instead to assess them in their entirety. In *Bussell I*, we vacated and remanded the order for prosecution costs, explaining that "the government cannot assess against a defendant costs associated *exclusively* with the counts on which he was acquitted." 414 F.3d at 1061 (emphasis added). On remand, the district court found that certain costs were associated exclusively with counts on which Letantia was acquitted, or not shown to be necessary for a conviction on count 12. Ordering Letantia to pay costs of prosecution in the amount of $55,626.09, the district court expressly excluded certain costs associated with (1) the grand jury transcripts, (2) pretrial and post-trial transcripts, (3) and several witnesses.

**[14]** In this appeal, Letantia again challenges the district court's factual finding that the remaining costs were not reasonable and necessary for the prosecution of count 12. We are unpersuaded by Letantia's argument. We have not adopted a "reasonable and necessary" standard upon which Letantia relies for the purposes of reviewing prosecution costs assessed

---

[16]Section 7201 provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, *together with the costs of prosecution*." 26 U.S.C. § 7201 (emphasis added).

against a defendant. Rather, in *United States v. Fowler*, 794 F.2d 1446 (9th Cir. 1986), we held that the government cannot assess costs "associated *exclusively* with the unsuccessful prosecution of [a co-defendant] or his acquittal on [other counts]." *Id.* at 1450 (emphasis in original). We followed that approach in *Bussell I*. 414 F.3d at 106. The district court found on remand that the costs assessed against Letantia were not associated exclusively with the counts in which she was acquitted. Because Letantia presents us with no persuasive evidence to dispute the district court's finding, we affirm the district court's order of prosecution costs.

V

We have one final issue to consider. Pursuant to Fed. R. Crim. P. 38, the district court stayed the 2002 order that Letantia pay a fine, restitution, and prosecution costs, on the condition that two trust deeds be recorded as security against property owned by L.T.K. Irrevocable Trust. In *Bussell I*, we vacated the district court's 2002 order. 414 F.3d at 1061. On remand, Letantia requested that the district court direct the court clerk to reconvey the trust deeds. The district court deferred consideration of the application for reconveyance of the trust deeds. Subsequently, based on its decision to enter a new order imposing restitution, prosecution costs, and a criminal fine on remand, the district court denied the application. Letantia now argues that the district court erred by denying such application for reconveyance.

Trust deeds are generally creatures of state law, and, in California, they operate as a conveyance of real property to secure payment of debt. *See, e.g.*, *Domarad v. Fisher & Burke, Inc.*, 270 Cal. App. 2d 543, 553-54 (1969). In this case, the trust deeds expressly provided that such deeds were being conveyed as security under Fed. R. Crim. P. 38 for the criminal fine, costs of prosecution, and restitution judgment entered against Letantia in 2002. Pursuant to Cal. Civ. Code § 2941(b)(1), "after the obligation secured by any deed of

trust has been satisfied, the beneficiary or the assignee of the beneficiary shall execute and deliver to the trustee the original note, deed of trust, request for a full reconveyance, and other documents as may be necessary to reconvey, or cause to be reconveyed, the deed of trust."

**[15]** We are therefore persuaded that the trust deeds in this case should have been reconveyed to the trustee of the L.T.K. Irrevocable Trust (not Bussell) upon the vacatur of the 2002 order for prosecution costs and restitution. The government offers no authority in opposition, and its arguments to the contrary are ultimately unavailing. We note, however, that the district court's post-remand order for restitution and prosecution costs survives the challenges Letantia launches in this appeal and, pursuant to Fed. R. Crim. P. 38(e)(2), the district court "may issue any order reasonably necessary to ensure compliance with a restitution order or a notice order after disposition of an appeal, including . . . (C) an order requiring the defendant to deposit all or part of any monetary restitution into the district court's registry; or (D) an order requiring the defendant to post a bond." Accordingly, we must reverse the district court's denial of Letantia's application for reconveyance of the trust deeds that attached to the now vacated 2002 order for restitution and prosecution costs, and remand for appropriate proceedings.

## VI

For the foregoing reasons, we affirm Letantia's sentence and the order for restitution and prosecution costs. We reverse, however, the district court's denial of the application for reconveyance of the trust deeds.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED.**