RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0300p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee,*

              *v.*                                             No. 07-3778

MARTIN W. ELSON,
                              *Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00164—Algenon L. Marbley, District Judge.

Argued: June 18, 2009

Decided and Filed: August 21, 2009

Before: KEITH, CLAY, and GIBBONS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Roger L. Kleinman, McDONALD HOPKINS LLC, Cleveland, Ohio, for
Appellant. Brenda S. Shoemaker, ASSISTANT UNITED STATES ATTORNEY,
Columbus, Ohio, for Appellee. **ON BRIEF:** Roger L. Kleinman, McDONALD HOPKINS
LLC, Cleveland, Ohio, for Appellant. Brenda S. Shoemaker, ASSISTANT UNITED
STATES ATTORNEY, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Defendant Martin W. Elson appeals the restitution portion
of his sentence entered following his plea of guilty to conspiracy to obstruct a grand jury
investigation in violation of 18 U.S.C. §§ 371 and 2. After a hearing on the issue of
restitution, pursuant to 18 U.S.C. § 3663A, the district court ordered Elson to pay
$2,492,424.66 in restitution, jointly and severally with three other individuals convicted of

1

crimes stemming from involvement in the same conspiracy giving rise to Elson's conviction. For the reasons set forth below, we **AFFIRM** Elson's sentence.

## BACKGROUND

### I.     FACTUAL BACKGROUND

This case arises from the efforts of Richard Schultz to conceal his assets from creditors, the United States Government, and his ex-wife.

#### A.     The Conspiracy

As set forth in the third superseding indictment, in the mid-1980s, Schultz filed a lawsuit related to an investment in thoroughbred racehorses. After he was unsuccessful, a California federal court entered judgments in favor of three of Schultz's creditors, totaling $5 million. In response to the judgments, Schultz conspired with numerous individuals to avoid payment to the creditors. The conspiracy sought to defraud Schultz's creditors by using third parties or "nominees" to purchase judgments against Schultz at a discount. To purchase the judgments, the individuals involved in the conspiracy used various incorporated entities, including Judgment Acquisition Corporation ("JAC"), Judgment Procurement Corporation ("JPC"), Judgment Resolution Corporation ("JRC"), and Cedarwood Acquisition Corporation ("Cedarwood"). Elson was among the individuals who controlled these entities at the direction of Schultz. The third-party entities purchased the judgments with Schultz's funds that previously were concealed in offshore accounts. Although Schultz was the true purchaser of the judgments, the nominees did not disclose to the creditors the nature of Schultz's interest. In addition to defrauding judgment holders, the conspiracy sought to defraud Schultz's ex-wife through harassing litigation designed to affect her legal claims against Schultz in various pending court proceedings.

#### B.     Elson's Participation

As a lawyer, Elson's participation in the conspiracy primarily consisted of arranging for the purchase of judgments entered against Schultz, generally at a substantial discount, by third parties who were controlled by Schultz.

In 1995, St. Paul Insurance Company ("St. Paul") hired Elson's law firm to collect a 1994 judgment against Schultz valued at approximately $2.7 million. Elson became involved in the matter, and pursued collection of the judgment on behalf of St. Paul, eventually obtaining the garnishment of Schultz's Individual Retirement Account ("IRA"), which was worth approximately $1.3 million. In November 1995, as counsel for St. Paul, Elson represented St. Paul in the sale of its interest in its $2.7 million judgment to Frances McPeak, a co-conspirator, for $450,000.

Also in November 1995, Elson agreed to represent McPeak's entity, JAC. The purpose of JAC was to purchase judgments against Schultz with Schultz's assets. Through his involvement with JAC, Elson assisted Domenic L. Massari, III, another co-conspirator and Schultz's attorney, in arranging for JAC to obtain a garnishment of Schultz's IRA. Elson also negotiated the purchase of a $1.7 million judgment against Schultz in favor of Everan Securities for $611,000. In addition, Elson was involved in the purchase of the "Bryant judgment"—a judgment obtained by Thomas Bourke on behalf of his client, Frank L. Bryant—valued at approximately $2.162 million, for $2 million.

In 1998, after learning that a grand jury was investigating Schultz's fraudulent activities, Elson "prepared documents that purported to reflect an intent for" the purchasers of the judgments against Schultz "to collect on the civil judgments against . . . Schultz." (J.A. 329.) For example, Elson filed briefs on behalf of JAC in the Ninth Circuit "purporting to be adverse to Schultz." (*Id.*) Although Elson represented to the courts and to the grand jury that the nominees' purchases of the judgments against Schultz were legitimate transactions, Elson "knew that the nominees were acting in part to obstruct the grand jury investigation." (J.A. 330.)[1]

## II.     PROCEDURAL HISTORY

On January 30, 2003, a grand jury returned a thirty-two-count second superseding indictment charging Elson, along with numerous other individuals, with conspiracy to defraud the United States, money laundering, wire fraud, mail fraud, tax

---

[1]Elson also was involved in a "controlled deposition" in Florida in 1996, where he "purport[ed] to be a lawyer adverse to . . . Schultz" despite the fact that he arranged and prepared Schultz for the deposition. (J.A. 327.)

fraud, and criminal forfeiture. With respect to Elson, the grand jury returned a third superseding indictment. Count one charged Elson with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, in addition to other fraud charges. As in the second superseding indictment, the grand jury charged that the object of the conspiracy was to defraud or attempt to defraud Schultz's creditors. Count two charged Elson with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Finally, count three charged Elson with conspiracy to obstruct justice in violation of 18 U.S.C. §§ 371 and 2.

On April 9, 2004, Elson pled guilty to count three of the third superseding indictment— conspiracy to obstruct justice—in exchange for the government dismissing the remaining counts in the indictment. In the plea agreement, Elson agreed to "pay restitution to victims of the conspiracy to defraud orchestrated by Richard Schultz" pursuant to 18 U.S.C. § 3663(a)(1)(A). (J.A. 209.) The plea agreement also provided that Elson, "recognizing that in limited circumstances he could have the right to appeal the sentence imposed, hereby knowingly, voluntarily and expressly waives the right to appeal his sentence on any ground." (J.A. 208.) At the plea hearing, the government clarified that Elson had "reserved the right . . . to contest at a sentencing hearing who a victim may be and whether they were harmed; and, if so, how much." (J.A. 322-23.)

On April 21, 2006, the district court sentenced Elson to a term of imprisonment of two months, and an additional eight months of home detention. The district court found that Elson did not have the ability to pay a fine, but would be "required to pay restitution to the victims of the fraud." (J.A. 351.) At the restitution hearing held later that day, the government presented several witnesses to establish the losses incurred by each victim as a result of the conspiracy. John Patrick Mazza, an attorney for St. Paul, testified that St. Paul incurred approximately $1.7 million in losses. In support of its restitution claim, St. Paul submitted a victim statement prepared by Kenneth Spence, the vice-president and general counsel for St. Paul at the time the sale of the judgment occurred.

Thomas Bourke also testified regarding the losses he sustained. According to Bourke, he represented Frank L. Bryant in an action against Schultz, and obtained a substantial judgment on behalf of his client. When Bryant became unable to pay his legal fees, the law firm agreed to collect the attorney fees out of his judgment against Schultz, and Bourke therefore acquired an interest in Bryant's judgment. Bourke testified that Schultz's use of "shill corporations and nominees" forced him to litigate in several states to locate Schultz's assets, requiring Bourke to pay substantial amounts in legal fees and travel costs. At the hearing, Bourke acknowledged that in 1998 he had agreed to sell his $2,052,000 judgment for $2 million, and to release civil claims against Schultz, Massari, Elson, and McPeak. According to Bourke, the 1998 settlement agreement did not address restitution payments. On cross-examination, Bourke testified that he also sold an attorney-fee claim he had pending in California court for $962,000 to Elson as part of the settlement, and acknowledged that he was requesting those same fees in his restitution petition. In addition, Bourke agreed that he was aware of most aspects of the fraud as alleged in the indictment at the time he entered into the settlement.

Following the hearing, in an extensive written order addressing the parties' post-hearing objections, the district court found Elson and three other convicted co-conspirators jointly and severally liable for $2,492,424.66 in restitution. The district court concluded that St. Paul was entitled to $1,748,000, and that Bourke should receive $744,424.66. Elson timely appealed, challenging only the restitution portion of his sentence.[2] On appeal, Elson argues that the district court applied the wrong statute in ordering restitution. Elson also contends that restitution was improper as to St. Paul because St. Paul was not a victim of the conspiracy to obstruct the grand jury investigation. With respect to the amount of restitution ordered, Elson argues that the government failed to prove the victims' losses by a preponderance of the evidence, and

---

[2]In its appellate brief filed six months prior to oral argument, the government addressed the merits of Elson's appeal. However, on June 10, 2009, eight days before oral argument, the government filed a motion to dismiss Elson's appeal. The government argued for the first time that Elson stipulated in his plea agreement that he waived the right to appeal his sentence except in limited circumstances that were inapplicable to Elson's appeal. However, given the government's delay in filing the motion, we decline to rule on the motion to dismiss and instead address the merits of Elson's appeal.

that the district court improperly awarded restitution for the attorney fees incurred by Bourke.

## DISCUSSION

### I.     APPLICABLE RESTITUTION STATUTE

#### A.     Standard of Review

Whether a restitution order is permitted under the law is subject to de novo review. *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006).

#### B.     Analysis

Elson argues that the district court erred in applying the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"). Elson first contends that the district court's use of the MVRA to determine the amount of restitution violated the Ex Post Facto Clause of the United States Constitution. Second, Elson maintains that application of the MVRA to determine the amount of restitution he owes is contrary to the terms of his plea agreement.

##### 1.     Ex Post Facto Clause

The MVRA, passed as part of the Antiterrorism and Effective Death Penalty Act of 1996, amended the Victim Witness Protection Act, 18 U.S.C. § 3663(a)(1)(A) ("VWPA"), and made restitution mandatory for offenses against property under Title 18, "including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA applies to convictions on or after April 24, 1996—the effective date of the statute—subject to constitutional limitations. *See* Pub. L. No. 104-132, § 211, 110 Stat. 1214, 1241 (1996); *see also United States v. Schulte*, 264 F.3d 656, 661 (6th Cir. 2001) ("The statutory notes under 18 U.S.C. § 2248 provide that the MVRA, including § 3663A, are to be effective to the extent constitutionally possible for . . . cases in which the defendant is convicted on or after April 24, 1996.").

Applying the MVRA to determine restitution for a crime committed prior to the effective date of the statute—even where a defendant's conviction occurs after the effective date of the MVRA—implicates the Ex Post Facto Clause. *See id.* at 662. Although some circuits have held that restitution is not punishment for purposes of the Ex Post Facto Clause, *see, e.g.*, *United States v. Newman*, 144 F.3d 531, 537-38 (7th Cir. 1998), this Circuit has concluded that restitution imposed under the MVRA constitutes punishment, and that "where an act was committed prior to the effective date of the MVRA, the retroactive application of the MVRA to that act violates the Ex Post Facto Clause." *Schulte*, 264 F.3d at 662.

Elson argues that determining restitution pursuant to the MVRA violates the Ex Post Facto Clause because his relevant criminal activity—selling St. Paul's judgment to McPeak in 1995—occurred prior to the effective date of the statute. However, in addition to engaging in criminal activities in 1995, Elson admitted, pursuant to his plea agreement, to conspiring to obstruct a grand jury investigation beginning in 1998, after the MVRA's effective date. Specifically, count three of the third superseding indictment, to which Elson pled guilty, charged that "[b]eginning in or about May 1998 and up through the date of this indictment, . . . [Elson] did unlawfully and knowingly conspire . . . to corruptly endeavor to obstruct and impede the due administration of justice ." (J.A. 143.) Moreover, Elson's conduct in advising St. Paul to sell its judgment to a Schultz nominee at a substantial discount was part of the larger conspiracy to commit mail and wire fraud to conceal Schultz's assets from creditors that continued through 2000. "[T]he ex post facto clause is not violated when a district court orders restitution under the MVRA for related but uncharged conduct that is part of a . . . scheme occurring prior to and continuing past the MVRA's effective date." *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir. 2003). Accordingly, the district court's application of the MVRA to determine Elson's restitution obligation did not violate the Ex Post Facto Clause.

**2.      Plea Agreement**

Elson also argues that the restitution order must be vacated because his plea agreement states that restitution will be determined pursuant to 18 U.S.C. § 3663(a)(1)(A), the provision applicable to Elson's offenses prior to the enactment of the MVRA.  Based on his plea agreement, Elson contends that the district court "was precluded as a matter of law from . . . sentencing Elson pursuant to the [MVRA]." (Def.'s Reply Br. 2.)  Thus, Elson argues that the district court did not comply with the terms of the plea agreement, and that it therefore exceeded its authority.

Rule 11 of the Federal Rules of Criminal Procedure sets forth three types of plea agreements:  (1) a plea agreement in which the government agrees to dismiss other charges; (2) a plea agreement where the government recommends that a particular sentencing range is appropriate; and (3) a plea agreement in which the government and defendant agree that a specific sentence or sentencing range is the appropriate disposition of the case.  Fed. R. Crim. P. 11(c)(1).

Where the parties agree that a particular sentence is appropriate, the court is bound by that agreed-upon disposition.  *See United States v. Fleming*, 239 F.3d 761, 764 (6th Cir. 2001) (noting that, under certain circumstances, once a court accepts a plea agreement, it is "bound by the bargain" the parties reached).  However, Rule 11(c) specifically provides that a "recommendation or request" that the court apply a particular sentence or sentencing range "does not bind the court."  Fed. R. Crim. P. 11(c)(1)(B). In this case, the parties did not agree on an appropriate sentence.  Instead, the plea agreement provides that the "the Court is not a party to and is not bound by this Plea Agreement or any recommendations or stipulations contained herein, including any stipulations to which the parties may agree."  (J.A. 203.)  The government and Elson further agreed that the "sentence will be imposed in accordance with the United States Sentencing Guidelines" and that "the Court has jurisdiction and authority to impose any sentence . . . . and that the final determination concerning sentencing rests within the sole discretion of the Court."  (J.A. 202.)  Accordingly, the district court was not bound by the plea agreement, and the plea agreement did not prohibit the district court from

determining restitution pursuant to the MVRA.  We therefore conclude that the district court properly applied the MVRA in sentencing Elson.

## II.        OFFENSE OF CONVICTION

Elson next argues that, because he pled guilty only to conspiracy to obstruct justice, he cannot be ordered to pay restitution for the losses of St. Paul and Bourke resulting from the broader conspiracy to commit mail and wire fraud.  In *Hughey v. United States*, 495 U.S. 411 (1990), the Supreme Court held that the VWPA authorized restitution to compensate victims "only for losses caused by the conduct underlying the offense of conviction." *Id.* at 416.  Examining the statutory language of the VWPA, the Court determined that "Congress intended restitution to be tied to the loss caused by the offense of conviction" rather than "all conduct attributable to the defendant, including conduct unrelated to the offense of conviction." *Id.* at 418.  In response, Congress amended the VWPA to expand the definition of "victim" to include a person harmed "as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2); *see United States v. Davis*, 170 F.3d 617, 627 (6th Cir. 1999).

Congress included an identical definition of "victim" when it enacted the MVRA. *See* 18 U.S.C. § 3663A(a)(2).  Therefore, under the MVRA, "'if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction.'" *United States v. Bussell*, 504 F.3d 956, 966 (9th Cir. 2007) (quoting *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996)). However, *Hughey* continues to "require[] the court to exclude injuries caused by offenses that are not part of the [conspiracy] of which [the defendant] has been convicted." *United States v. George*, 403 F.3d 470, 474 (7th Cir. 2005).

Because Elson was convicted pursuant to a guilty plea rather than by a jury, the court should look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the "offense of conviction" for purposes of restitution. *United States v. Akande*, 200 F.3d 136, 142 (3d Cir. 1999); *United States v. Adams*, 363 F.3d 363, 366 (5th Cir. 2004); *see also* S. Rep. No. 104-179, *reprinted in* 1996 U.S.C.C.A.N. 924, 932 (discussing the purpose of the 1996 amendments to the VWPA and distinguishing "conviction[s] . . . obtained by a plea bargain" for purposes of determining the offense of conviction); *cf. United States v. Ramirez*, 196 F.3d 895, 900 (8th Cir. 1999) (noting that the indictment defines the scope of the criminal scheme for restitution purposes when a defendant is convicted by a jury). Thus, where a defendant is convicted after pleading guilty, a court may "consider[] a plea agreement when defining the scope of a fraudulent scheme and amount of restitution." *United States v. Cothran*, 302 F.3d 279, 290 (5th Cir. 2002).

For example, in *Adams*, the Fifth Circuit reviewed its prior case law emphasizing that, where a defendant is convicted based on a guilty plea, "the scope of the underlying scheme is defined by the parties themselves" through the plea negotiations and plea agreement. 363 F.3d at 367. In concluding that the district court erred in focusing on the strict letter of the indictment in defining the offense of conviction, the court in *Adams* noted that it previously had examined "the 'context' of [a defendant]'s guilty plea" to determine "the parties' mutual understanding" regarding the offense of conviction. *Id.* at 366 (quoting *United States v. Arnold*, 947 F.2d 1236, 1238 (5th Cir. 1991)). Similarly, in *Cothran*, the court examined the defendant's plea agreement and determined that the plea agreement's references to "victims" and "other computer and delivery companies" demonstrated that the "plea agreement contemplated a scheme that went beyond the June 1998 fraud on [one specific company] to the other frauds alleged in the indictment." 302 F.3d at 290. Based on these references, the court "interpret[ed] the conviction as part of this broader scheme," and upheld the district court's award of restitution to all of the victims of the broader scheme. *Id.*

The plea colloquy in Elson's case reveals that the parties intended to include a broader range of acts in the offense of conviction than those related solely to the conspiracy to obstruct the grand jury investigation. Although Elson's plea agreement did not set forth any factual basis for the plea, at the plea hearing, the factual basis for Elson's conviction included the entire course of Elson's fraudulent activity, including his representation of St. Paul in the sale of its judgment to a Schultz nominee. Elson did not object to the government's recitation of the facts supporting his conviction; instead, he acknowledged that they were correct:

| | |
|---|---|
| The Court: | Mr. Elson, did you hear the statement of facts as set forth by Special Agent Hanzel? |
| The Defendant: | Yes, your Honor, I did. |
| The Court: | Were those facts true and correct in all respects? |
| The Defendant: | They are correct, Your Honor. |
| The Court: | Are you offering to plead guilty here today because you are in fact guilty of the allegations set forth in Count 3 of the third superseding indictment? |
| The Defendant: | Yes. |

(J.A. 330.) Consequently, the parties' statements at the plea colloquy indicate that they understood the conspiracy to obstruct a grand jury investigation as part of the broader conspiracy to defraud Schultz's creditors, including St. Paul and Bourke. The overt acts pertaining to Elson's offense of conviction included "further[ing] Richard Schultz's interests" by "conspir[ing] . . . to purport to represent Schultz's nominee . . . . to make it appear to the grand jury and others that the acquisition of the judgments and other false transactions were legitimate." (J.A. 329.) Elson's false representation that the nominees—which had purchased the judgments against Schultz—were adverse to Schultz furthered the conspiracy to defraud Schultz's creditors. Thus, the plea colloquy demonstrates that the parties "contemplated a [conspiracy] that went beyond" the specific overt acts associated with conspiring to obstruct the grand jury investigation. *See Cothran*, 302 F.3d at 290. The district court therefore was not limited to the overt acts supporting Elson's conviction for conspiracy to obstruct justice, and had authority

to order restitution for losses resulting from any conduct that was part of the conspiracy. *See Bussell*, 504 F.3d at 966.

Moreover, Elson explicitly agreed to pay restitution to victims of the broader conspiracy in his plea agreement. Under the MVRA, a court must "order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." 18 U.S.C. § 3663A(a)(3). However, vague references to "victims" are insufficient to bind a defendant to pay restitution beyond that authorized under the MVRA. For example, in *United States v. Randle*, 324 F.3d 550 (7th Cir. 2003), the court found that the defendant did not agree in his plea agreement to pay restitution to victims other than those of the offense of conviction. The defendant pled guilty to defrauding one particular victim, but the plea agreement made references to "victims" and noted the aggregate amount of loss suffered by all three victims. *Id.* at 557. The government argued that such "references indicate an intention to pay restitution in the full amount of the loss," rather than just to the one victim affected by the offense of conviction. *Id.* In rejecting that argument, the court noted that the references "are just as easily seen as a necessary factor for the calculation of Randle's base offense level under the federal sentencing guidelines." *Id.*

In contrast to the plea agreement in *Randle*, Elson's plea agreement explicitly provides that Elson will "pay restitution to victims of the conspiracy to defraud orchestrated by Richard D. Schultz" (J.A. 209), which is an offense different from his offense of conviction—conspiracy to obstruct a grand jury investigation. The only possible meaning of the restitution provision in Elson's plea agreement is that he agreed to pay restitution to victims of the broader conspiracy described in count one of the third superseding indictment. Significantly, the plea agreement states that he will pay restitution to victims of the "conspiracy to defraud"—the same label used to identify count one of the third superseding indictment—rather than merely "the conspiracy" or "the offense." Thus, under the explicit language in the plea agreement, Elson agreed to pay restitution to victims of the entire conspiracy to defraud Schultz's creditors. *Compare United States v. Johnson*, 132 F.3d 1279, 1286 n.4 (9th Cir. 1997) (finding that

the plea agreement did not contain a provision specifying that the defendant will pay restitution for offenses other than his offense of conviction because the "plea agreement included no provision preserving [the defendant]'s responsibility to pay restitution for the charges dismissed under the agreement"), *and United States v. Butler*, 297 F.3d 505, 519-20 (6th Cir. 2002) (noting that, because "Butler's plea agreement does not contain any provision specifically discussing restitution," the district court on remand could order Butler to make restitution only for the loss related to his specific offense of conviction).

Accordingly, the district court properly ordered Elson to pay restitution to the victims of the conspiracy to defraud Schultz's creditors.

## III.    BOURKE'S ATTORNEY FEES AS LOSSES[3]

The district court concluded that Bourke was entitled to $744,424.66 in restitution representing expenses incurred in assisting the government in investigating the conspiracy and "the costs and fees resulting from efforts to collect from, or defend himself against, Schultz and Defendants." (J.A. 154.) Elson challenges the district court's inclusion of Bourke's attorney fees in the restitution award, arguing that the MVRA prohibits the award of consequential damages such as attorney fees and that the government failed to prove the reasonableness of Bourke's fees.[4]

---

[3] In his issues presented for review, Elson lists several reasons as to why the district court's inclusion of Bourke's attorney fees in the restitution amount was improper. Among those reasons, Elson includes the assertion that "Bourke recovered $30,000 from co-conspirator Larry Carnahan ("Carnahan")." (Def.'s Br. 2.) However, he makes no other mention of this amount or Carnahan in his brief. Because Elson has failed to develop the argument, he has waived it on appeal. *See Johnson*, 440 F.3d at 846.

[4] In a two-sentence section at the end of his brief, Elson argues that Bourke is not a victim for purposes of restitution because Bourke, when he settled with McPeak, knew that McPeak was involved in the conspiracy. In addition to waiving the argument by failing to develop it on appeal, *see Johnson*, 440 F.3d at 846, Elson's assertion that Bourke was "a participant in the offense" and therefore not a victim is without basis. While Bourke knew that McPeak was involved in a fraudulent scheme, Bourke's actions did not further the conspiracy or in any way defraud Schultz's creditors. Instead, Bourke was a Schultz creditor whom McPeak sought to defraud. Accordingly, Bourke was not a participant in the conspiracy, and his knowledge of the fraudulent actions of McPeak and the other members of the conspiracy does not preclude him from being a victim for purposes of the MVRA. *Cf. United States v. Mousseau*, 517 F.3d 1044, 1048 (8th Cir. 2008) (concluding that the minor to which the defendant provided methamphetamine was a victim for purposes of restitution because, although the minor engaged in an illegal act, the minor was not a "participant in an offense" because the minor did not commit the same offense—providing a controlled substance to a minor—as the defendant).

**A.       Standard of Review**

"We review de novo the question of whether restitution is permitted under the law, and review the amount of a restitution award for abuse of discretion." *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009).

**B.       Attorney Fees as Recoverable Losses**

Where an offense involves damage to or loss of property, the MVRA restricts restitution to the replacement value of the property.  18 U.S.C. § 3663A(b)(1); *see United States v. Akbani*, 151 F.3d 774, 779-80 (8th Cir. 1998) (construing identical language in the VWPA).  In cases involving such offenses, several circuits have held that a district court lacks authority under the VWPA to order restitution for attorney fees and similar "consequential damages involved in determining the amount of the loss or in recovering those funds." *United States v. Schinnell*, 80 F.3d 1064, 1071 (5th Cir. 1996).  In *Schinnell*, the Fifth Circuit found that the district court erred in including a victim's "accounting fees and cost[s] to reconstruct the bank statements for the time period that the defendant perpetuated []his scheme." *Id.* at 1070.  Similarly, the Third Circuit has stated that, "[i]n defining the substantive boundaries of compensation in cases where restitution is ordered for offenses resulting in the loss of property," restitution is restricted to an amount "'pegged to the *actual* losses suffered by the victims'" and does not include consequential damages such as attorney fees.  *Gov't of Virgin Islands v. Davis*, 43 F.3d 41, 44-45 (3d Cir. 1994) (quoting *United States v. Barany*, 884 F.2d 1255, 1260 (9th Cir. 1989)).  Where, as in Elson's case, the offense does not involve damage to or loss or destruction of property, however, the MVRA "requires only that the restitution ordered by the district court be based on losses 'caused by the specific conduct that is the basis for the offense of conviction.'" *Akbani*, 151 F.3d at 780 (quoting *United States v. Marsh*, 932 F.2d 710, 712 (8th Cir. 1991)).  Accordingly, "there is no blanket prohibition . . . against inclusion of attorneys' fees in the calculation of a restitution amount for offenses that do not result in damage to or loss or destruction of property." *Id.*

In addition, attorney fees also may be recoverable pursuant to § 3663A(b)(4), which requires a district court, "in any case," to order restitution to "reimburse the victim for . . . other expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4). While this Circuit has yet to interpret the meaning of "other expenses" in the context of § 3663A(b)(4), several other circuits have addressed the issue. In *United States v. Waknine*, 543 F.3d 546 (9th Cir. 2008), the defendant argued that the attorney fees incurred by the victims were "too indirectly related to the offense conduct to be reimbursed" under § 3663A. *Id.* at 558. Although the court remanded the case to the district court for more detailed evidence as to the type of attorney fees incurred, the court directed the district court to "award restitution of . . . attorneys' fees [only] if the government provides sufficiently detailed evidence to demonstrate by a preponderance of the evidence that these costs were incurred by [the victims] in aid of Waknine's investigation or prosecution, and that such expenses and costs were reasonably necessary." *Id.* at 559. In *United States v. Amato*, 540 F.3d 153 (2d Cir. 2008), the defendants also challenged the inclusion of attorney fees in the restitution amount. In rejecting the defendants' argument, the court held "that 'other expenses' incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs." *Id.* at 159.

## C.     Bourke's Fees

As the district court recognized, the government sought two categories of attorney fees on behalf of Bourke. First, the government requested the attorney fees Bourke incurred in defending himself against the fraudulent lawsuits filed against him as part of the scheme devised to frustrate Bourke's and other creditors' attempts to recover judgments against Schultz. Because these fees were not incurred during Bourke's "participation in the investigation or prosecution of the offense," *see* 18 U.S.C. § 3663A(b)(4), in order to be recoverable, the attorney fees must have been "'caused by the specific conduct that is the basis for the offense of conviction.'" *Akbani*, 151 F.3d at 780 (quoting *Marsh*, 932 F.2d at 712); *see Hughey*, 495 U.S. at 416.

We agree with the district court's conclusion that the attorney fees Bourke sustained defending himself against the fraudulent lawsuits are recoverable.  It is undisputed that a central part of the conspiracy was "to engage in sham lawsuits" (J.A. 132), including deceptive litigation techniques such as controlled depositions and collusive filings in civil court.  The time and resources Bourke spent defending the lawsuits directly resulted from the filing of collusive lawsuits by Elson and his co-conspirators in furtherance of the scheme to conceal assets from and to frustrate the collection efforts of Schultz creditors such as Bourke.  Accordingly, the portion of Bourke's fees related to defending himself against fraudulent lawsuits is recoverable.  *See United States v. Havens*, 424 F.3d 535, 539 (7th Cir. 2005) (upholding inclusion of attorney fees "paid [by an identity fraud victim] to counsel or other experts for dealing with the banks and credit agencies in the effort to correct her credit history and repair the damage to her credit rating" in the restitution order).

The government also sought the attorney fees Bourke incurred in attempting to collect a civil judgment against Schultz.  As noted above, Bourke secured a judgment on behalf of his client, Bryant, against Schultz in California state court, which Bryant later assigned to Bourke.  At the restitution hearing, Bourke testified that the co-conspirators' use of nominees to hide Schultz's assets made it more difficult for him to locate available assets for purposes of collecting the California judgment.  Bourke stated that his attorney fees resulted from "chasing Mr. Schultz's assets around the world" in an attempt to collect on the court's judgment.  (J.A. 376.)  More specifically:

> Instead [of receiving the value of the judgment by return mail], we had to discover from piercing a stone wall, after months and months of discovery . . . , we had to . . . find out from the[ documents] where the assets had gone, figure out the lies and deception that were going in [sic] to block us and then figure out what to do about that and what courts to go to and what courts to present the evidence to.  And that took hundreds of thousands of hours of time and we had to hire lawyers in New York, Florida, Illinois, Ohio, and we ourselves did the California work.

(J.A. 379.)  Bourke further estimated that "there were between 11 and 36 layers of phony corporations and shills that [Schultz] was using that we had to . . . prove to some court somewhere that he was using these."  (J.A. 380.)  Bourke therefore incurred significant

attorney fees and other costs in researching and uncovering the numerous layers of nominees created by the Schultz conspiracy in an attempt to hide Schultz's assets.

We conclude that the costs Bourke expended to locate Schultz's assets are recoverable under § 3663A(b)(4). On this issue, the Eighth Circuit's recent decision in *United States v. Stennis-Williams*, 557 F.3d 927 (8th Cir. 2009), is instructive. In *Stennis-Williams*, the defendant was an attorney appointed as the personal representative of an estate. *Id.* at 928. The defendant subsequently defrauded the estate of over $200,000. *Id.* In the course of discovering and investigating the fraud, the estate paid approximately $70,000 in attorney and accountant fees, which the district court included in its restitution order. *Id.* at 928, 930. On appeal, the Eighth Circuit concluded that "the district court did not clearly err by including the estate's investigative costs in its restitution calculation" because the fees were recoverable pursuant to § 3663A(b)(4). *Id.* at 930. The court reasoned that "privately incurred investigative costs constitute foreseeable losses that are directly caused by a defendant's fraudulent conduct." *Id.*

Based on the reasoning set forth in *Stennis-Williams*, Bourke's attorney fees are recoverable under § 3663A(b)(4). Like the estate in *Stennis-Williams*, Bourke sustained significant costs and fees in discovering and investigating the numerous layers of shill corporations and nominees related to Schultz's fraud. While Bourke did not investigate the fraud as part of the government's prosecution of Elson and his co-conspirators, Bourke's costs and fees "constitute foreseeable losses that [we]re directly caused" by the conspiracy's act of concealing Schultz's assets from creditors such as Bourke. *See id.* We therefore follow the reasoning of the Eighth Circuit in *Stennis-Williams* and conclude that Bourke's attorney fees incurred in pursuing the Bryant judgment are recoverable under § 3663A(b)(4).

Alternatively, the attorney fees and costs Bourke expended in attempting to collect the judgment against Schultz constitute losses that were "caused by the specific conduct that is the basis of the offense of conviction." *Hughey*, 495 U.S. at 413; *see Akbani*, 151 F.3d at 780. Generally, attorney fees incurred in civil litigation against the defendant for the same acts at issue in the criminal proceedings are consequential

damages that are not recoverable. *E.g.*, *United States v. Seward*, 272 F.3d 831, 839 (7th Cir. 2001) ("In calculating . . . the actual loss amount for restitution, the district court should include in the calculation all direct damages, but not include consequential or incidental damages [such as attorney fees].").  However, where a victim's attorney fees are incurred in a civil suit, and the defendant's overt acts forming the basis for the offense of conviction involved illegal acts during the civil trial, such as perjury, such fees are directly related to the offense of conviction and therefore are recoverable as restitution under the MVRA.  *See United States v. DeGeorge*, 380 F.3d 1203, 1221-22 (9th Cir. 2004).

In *DeGeorge*, the defendant "participated in a scheme to defraud by purchasing a yacht, inflating its value through a series of sham transactions, [and] obtaining insurance [from Cigna Property and Casualty Company ("Cigna")] on the yacht at the inflated value." *Id.* at 1207.  After obtaining insurance, the defendant furthered his scheme by "scuttling [the yacht] off the coast of Italy, and attempting to collect the insurance proceeds, in part by lying about the cause of the sinking during civil litigation with the yacht's insurer." *Id.* at 1207-08.  When payment was sought under the terms of the insurance policy, "Cigna refused to pay . . . . [and] filed a civil lawsuit against the defendant [and his co-conspirators] seeking rescission of the insurance contract." *Id.* at 1210.  At trial, Cigna prevailed and was awarded attorney fees. *Id.*

One year after the judgment was affirmed, the defendant was indicted for mail fraud, wire fraud, and perjury. *Id.*  At sentencing following his conviction on all counts, the district court ordered restitution of almost $3 million, "which was the amount of attorney's fees incurred by Cigna in defending the civil case." *Id.* at 1221.  On appeal, the court of appeals affirmed the district court's inclusion of attorney fees in the restitution award.  The court reasoned that the defendant's offense "included his perjury and other conduct during the civil trial" and therefore "the insurance company's expenses in the civil trial were *directly*, not tangentially, related to [the defendant]'s offenses." *Id.*

Similarly, Bourke's attorney fees incurred in pursuing the Bryant judgment were a direct result of the acts forming the basis of the Schultz conspiracy. As alleged in the indictments:

> It was part of the conspiracy that . . . Defendants . . . orchestrated a series of false and fraudulent transactions that were designed to make it appear that Richard Schultz had spent or lost millions of dollars through business deals . . . when, in fact, the Defendants and others assisted Schultz in concealing, shielding and transferring Schultz's assets . . . both within and outside the United States to hide the existence, location, source, ownership, nature, and control of such assets.

(J.A. 79.) Bourke testified at the restitution hearing that the use of nominees to conceal the existence and true ownership of Schultz's assets required Bourke to "chas[e] Mr. Schultz's assets around the world" in an attempt to collect on the judgment. (J.A. 376.) Bourke's testimony evinces that the time he spent pursuing Schultz's assets and attempting to unravel the numerous layers of nominees "reflect the losses [Bourke] suffered as a direct result" of the actions of Elson and his co-conspirators in concealing Schultz's assets. *See Havens*, 424 F.3d at 539. Thus, the district court did not err in concluding that Bourke's attorney fees could be included in the restitution award.

### D.     Proof of Bourke's Loss

Elson next argues that the government failed to show that the fees sought on behalf of Bourke were reasonable and further argues that, because Bourke actually seeks compensation for his own time, the government failed to show that Bourke suffered any loss.

Under 18 U.S.C. § 3664(e), the "burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government." At the restitution hearing, the government presented the testimony and billing records of Bourke. Bourke testified that he incurred excessive legal fees and costs, including the expenditure of his own time, because of the actions of the Schultz conspirators. As the government summarized in its post-hearing brief:

> The conspirators operated . . . to "frustrate" Bourke and his clients through unlawful means at virtually every juncture between mid-1994 and early 1998, causing him to incur fees and expenses for which he was not compensated. Kennedy and Bogart hid assets in and through Canada based on false transactions that were virtually impossible to penetrate and they concealed funds in offshore accounts that were beyond the reach of the civil litigants. In fact, when Bourke attempted to expose those and other transactions, the defendants sought to impede his progress through false statements and sham litigation perpetrated by Elson and Massari. Bourke testified that he incurred excessive litigation costs and fees . . . , including the costs and fees associated with the sham litigation.

(J.A. 261.)

Had Bourke hired a different attorney to pursue the collection efforts on behalf of himself and Bryant, Bourke would have incurred attorney fees as a result of the conspiracy's efforts to conceal assets. That Bourke performed the legal services himself should not preclude recovery of the amounts he expended as a direct result of the actions of Elson and others. *See Havens*, 424 F.3d at 539 ("To the extent that [the victim of identity fraud] spent time that otherwise would have been compensated, perhaps because she had to miss work and forego hourly compensation, or because she had to turn down professional clients to whom she could have provided services if she was not occupied with her credit restoration activities, her time may be compensated. Time spent for which the opportunity cost was zero, however, cannot be the subject of compensation . . . ."). Bourke testified at the restitution hearing that he spent "hundreds of thousands of hours" pursuing the judgment against Schultz, time that could have been spent performing work for other clients. Accordingly, through Bourke's testimony, the government proved the amount of losses Bourke incurred by a preponderance of the evidence.

With respect to the reasonableness of Bourke's fees, Bourke provided numerous pages of time sheets to the district court and explained how he allocated his work on the Schultz case between collection efforts and other matters. Further, during the restitution hearing, Bourke was subject to cross-examination by several of the defendants with respect to certain entries in his time sheets. Without any evidence to suggest that Bourke falsified his time sheets or otherwise did not spend the time claimed on collection

activities, Elson has failed to show that the district court clearly erred in concluding that the government "establish[ed] that the damages [Bourke] sustained amounted to $744,424.66." (J.A. 159.) Aside from alleging that the government failed to prove that the fees were reasonable, Elson offers no argument that the fees were unreasonable, or that Bourke's hours were excessive. Accordingly, we see no reason to overturn the district court's determination that the government established Bourke's loss by a preponderance of the evidence.

## IV.    ST. PAUL'S LOSSES

### A.    Standard of Review

As noted above, an appellate court reviews whether restitution is permitted under the applicable statute de novo, and reviews the amount of restitution awarded for abuse of discretion. *Boring*, 557 F.3d at 713.

### B.    St. Paul as a Victim

Under the MVRA, a victim is any person harmed "as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Having previously determined that the district court properly ordered Elson to pay restitution to the victims of the broader conspiracy to defraud, rather than only to persons who suffered harm as a result of the conspiracy to obstruct justice, we conclude that St. Paul qualifies as a victim for purposes of the MVRA.

In addition, contrary to Elson's argument that St. Paul's losses on the sale of its judgment resulted from business reasons, St. Paul's losses were caused by the overt acts underlying the conspiracy. As Mazza detailed at the restitution hearing, St. Paul retained a law firm to assist it in defending itself against Schultz in California state court litigation. After Schultz as the plaintiff was unsuccessful, in 1995, the court awarded the law firm attorney fees and costs. The law firm then assigned its interest in the judgment for attorney fees to St. Paul. To assist in collecting the attorney-fee judgment against

Schultz, valued at approximately $2 million, St. Paul hired Elson, then working for the law firm Ulmer & Berne. Mazza testified that, based on his discussions with the St. Paul agents responsible for entering into the 1995 settlement with McPeak, St. Paul would not have sold its judgment "if they had known they were selling it to a nominee of Richard Schultz." (J.A. 357-58.) Further, Mazza testified that St. Paul relied solely on the advice of Elson in selling the judgment at such a substantial discount.

Elson nonetheless maintains that there is no direct evidence that "but for" his advice, St. Paul would not have sold the judgment, emphasizing the inherent risk of pursuing a judgment and the possibility that Schultz would become insolvent as factors that prompted St. Paul to settle. In addition, Elson contends that the letters between Massari, on behalf of McPeak, and Elson, on behalf of St. Paul, regarding the details of the sale of St. Paul's judgment demonstrate that St. Paul was aware that McPeak was a nominee of Schultz.

The district court, in making findings of fact in its restitution order, rejected Elson's assertions:

> [T]he Court specifically found credible evidence that the actions of the Defendants, as part of the Schultz conspiracy, directly caused the losses to St. Paul . . . . Specifically, the Government presented reliable evidence that proved, by a preponderance of the evidence, that: (1) Elson failed to disclose to St. Paul all material facts in connection with its decision to sell its judgment to McPeak; [and] (2) Elson did not disclose that McPeak essentially worked for Schultz. . . . The actions of Elson and his co-conspirators lead [sic] St. Paul to sell its judgment at a loss. Their fraud negates any potential business reason St. Paul may have had for selling its judgment at this dramatic of a discount.

(J.A. 177-78.) These findings are not clearly erroneous. Mazza, based on conversations with the relevant decision-makers at St. Paul, testified that had St. Paul known that McPeak was a nominee for Schultz, it would not have entered into the agreement to sell its judgment against Schultz for less than one-fourth of its value. *Cf. United States v. Gallant*, 537 F.3d 1202, 1249 (10th Cir. 2008) (concluding that a victim's expenses in marketing a credit portfolio were recoverable because the expenses "were incurred because of [the defendants'] misrepresentations"—had the victim "known that the

portfolio was only worth about thirty per cent of its $200 million face value, he would have known that it was unlikely he would be able to find a buyer, and likely would not have incurred the expenses to market the account").  While cross-examination by the defendants raised the possibility that business reasons—such as the uncertainty of recovery and the expectation that settlements sometimes involve discounted value—might have influenced St. Paul's decision, neither Elson nor any of his co-defendants offered any evidence that Mazza's testimony was false, misleading, or otherwise unreliable.  *See United States v. Brika*, 487 F.3d 450, 457 (6th Cir. 2007) (noting that to challenge the district court's reliance on hearsay evidence at sentencing, a defendant "must establish that the challenged evidence is materially false or unreliable").

Further, as the district court found, the letters sent by Massari on behalf of McPeak to Elson as a representative of St. Paul do not reveal the true relationship between Schultz and McPeak.  While the letters contemplate that Schultz would agree to release $450,000 from his IRA account in the event that McPeak failed to pay that same amount as the purchase price for the judgment, the letter does not discuss any relationship between McPeak and Schultz, or reveal that Schultz was supplying McPeak with Schultz's own funds to buy the judgment from St. Paul.  Beyond asserting that St. Paul received "full disclosure of all material facts," Elson does not point to any evidence that would have put St. Paul on notice that Schultz rather than McPeak was purchasing the judgment.  Consequently, the district court properly determined that St. Paul was a victim for purposes of the MVRA.

### C.    Reliability of Mazza's Testimony in Proving St. Paul's Loss

Elson also challenges the district court's reliance on Mazza's testimony to determine St. Paul's losses, arguing that because Mazza's testimony was unreliable hearsay,[5] it was inadmissible and, because the government produced no other evidence of St. Paul's losses, the government failed to meet its burden of proving St. Paul's loss by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e).

Elson contends that the district court erred in relying on Mazza's testimony because "there was no indicia of reliability." (Def.'s Br. 17.)  In *United States v. Silverman*, 976 F.2d 1502 (6th Cir. 1992) (en banc), this Court reiterated its previous position that a "district court may consider hearsay evidence in determining sentence, but the accused must be given an opportunity to refute it, and the evidence must bear some minimal indicia of reliability in respect of defendant's right to due process." *Id.* at 1512 (emphasis removed).  Accordingly, Mazza's testimony must  "bear[] some indicia of reliability" to serve as a basis for determining the restitution portion of Elson's sentence. *See id.*

At the restitution hearing, Mazza testified that St. Paul calculated its loss resulting from the Schultz conspiracy's fraud by subtracting the amount it received in settlement—$450,000—from the value of the judgment, including interest, at the time the settlement was made.  The value of the judgment was based on a previously issued California court order granting attorney fees to St. Paul's predecessor in interest.  The California court order also provided for interest to accrue on the amount of the judgment as of 1990.  Thus, Mazza's testimony as to the amount of loss was based on documentary evidence submitted by St. Paul, and by a court order establishing a basis for calculating the value of the judgment at the time of settlement.  Mazza's testimony as to the amount of loss was more than a "mere allegation," and thus bore some indicia of reliability. *See United States v. Lowenstein*, 108 F.3d 80, 83-84 (6th Cir. 1997) (finding that, for purposes of sentencing, a probation officer's petition which "merely asserts, without

---

[5]In his opening brief, Elson challenged the admissibility of Mazza's testimony on the grounds that it was hearsay.  However, in his reply brief, he acknowledged that hearsay testimony is admissible at sentencing. *See* Fed. R. Evid. 1101(d)(3); *Davis*, 170 F.3d at 622.

further detail or explanation, that defendant left the judicial district without permission . . . . , standing alone, lacks the indicia of reliability" necessary under *Silverman*). Consequently, the district court's reliance on Mazza's testimony did not violate Elson's rights. *See United States v. Hadley*, 431 F.3d 484, 511 (6th Cir. 2005) (describing the "indicia of reliability" requirement as a "modest standard"). The district court therefore properly found that the government established St. Paul's loss by a preponderance of the evidence.

## V.     OFFSET OF THE RESTITUTION OBLIGATION

### A.     Standard of Review

"We review de novo the question of whether restitution is permitted under the law, and review the amount of a restitution award for abuse of discretion." *Boring*, 557 F.3d at 713.

### B.     Analysis

Elson's final argument on appeal is that he was entitled to an offset—in part or in whole—of his restitution obligation. First, he argues that Bourke released his claim for attorney fees in a settlement with Schultz, precluding the district court from including those fees in its restitution order. Second, Elson contends that McPeak's return of certain judgments relieves Elson of his responsibility to pay restitution because the value of those judgments exceeds his restitution obligation.

The MVRA contains several provisions that address the relationship between a district court's restitution order and other sources of compensation for victims' losses. *See United States v. Bright*, 353 F.3d 1114, 1122 (9th Cir. 2004). In addition to making restitution mandatory for certain crimes, the MVRA amended § 3663, allowing a district court to order restitution "for a loss for which the victim has received or is entitled to receive compensation." *Id.* at 1121. Section 3664 reinforces this principle, directing district courts to order restitution in "the full amount of a victim's loss . . . without regard to other sources of compensation for the victims." *Id.* (emphasis removed); *see* 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled

to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."). As the court in *Bright* explained, any offsets stemming from a victim's compensation from other sources are "to be handled separately as potential credits against the defendant's restitution obligation—not as reductions in the amount of that obligation in the first instance." *Bright*, 353 F.3d at 1121; *see* § 3664(f)(2) ("Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim . . . .").

### 1.     Settlement Offset

Elson first argues that the district court erred in including Bourke's attorney fees in the restitution amount because Bourke released his claim for such attorney fees pursuant to a 1998 settlement with Schultz. As discussed above, in 1998, Bourke sold an attorney-fee claim of $962,000 then pending in California court to Elson, and also released his civil claims against Elson and several other co-defendants. During the restitution hearing, Bourke testified that the $962,000 in fees he sought in California court in connection with the Schultz litigation—the fees included in the claim he sold to Elson—comprised the same fees he listed in his victim statement of loss.

In *United States v. Bearden*, 274 F.3d 1031 (6th Cir. 2001), this Court held "that a private settlement between a criminal wrongdoer and his victim releasing the wrongdoer from further liability does not preclude a district court from imposing a restitution order for the same underlying wrong." *Id.* at 1041. Other circuits have reached similar conclusions. For example, in *Gallant*, the defendants settled with the banking institution victim for $60,000 in exchange for the victim's agreement to release the defendants "from further liability." 537 F.3d at 1249. The court found that the "settlement does not bar restitution" under the MVRA, noting that "[a] private settlement cannot abrogate [the mandatory] language" of the statute. *Id.* at 1250; *see also United States v. Sheinbaum*, 136 F.3d 443, 448 (5th Cir. 1998) (concluding that, because restitution is a penal rather than compensatory measure, a district court "possess[es] the discretion to impose restitution orders in spite of civil settlements"). Therefore, under

*Bearden* and similar cases, the fact that Bourke settled his pending claims—including his fee petition—did not preclude the district court from awarding restitution.

However, courts also have recognized that a defendant should not have to pay a victim for the same loss twice. In *Bearden*, although the court rejected the defendant's argument that his $47,000 settlement with the victim prevented the sentencing court from ordering restitution, the court reduced the defendant's restitution obligation by the amount the defendant paid in the settlement:

> In this case, Bearden would have his payment of $47,000 erase the rest of the $161,590 restitution imposed. As the Supreme Court [has] indicated . . . , the purposes of criminal restitution include punishment. It would be improper to permit private parties to release criminal wrongdoers from punishment. Thus, under our holding today Bearden still owes [the victim] $114,590 in restitution.

*Bearden*, 274 F.3d at 1041; *see also United States v. McDaniel*, 398 F.3d 540, 555 (6th Cir. 2005) (noting that "the restitution statutes do not permit victims to obtain multiple recoveries for the same loss"). Thus, "when determining the amount of a restitution award under the MVRA, the court must 'reduce restitution by any amount the victim received as part of a civil settlement' . . . . to avoid[] the undesirable result of restitution effectuating a double recovery." *Gallant*, 537 F.3d at 1250 (citation omitted).

"[T]he burden of proving an offset should lie with the defendant." *Sheinbaum*, 136 F.3d at 449. The restitution statute "allocates the various burdens of proof among the parties who are best able to satisfy those burdens." *Id.* Because "the defendant should know the value of any compensation he has already provided to the victim in civil proceedings, . . . the burden should fall on him to argue for a reduction in his restitution order." *Id.* Here, beyond proffering evidence of the settlement itself, Elson has not shown that Bourke received compensation for the attorney fees he now seeks. The record demonstrates that, although Bourke released his fee claim as part of the settlement, he never received compensation for the attorney fees. While Bourke received $2 million from Schultz in the settlement in exchange for the judgment worth approximately $2,052,000, his pending attorney-fee claim of $962,000 remained uncompensated. The district court therefore properly concluded that the settlement did

not bar restitution for attorney fees and, thus, contrary to Elson's argument, there was no double recovery.

## 2.     Offset for McPeak's return of judgments

Elson also argues that co-defendant McPeak's agreement to return the judgments "in question to the government" satisfied Elson's restitution obligation. (Def.'s Br. 11-12; Def.'s Reply Br. 3-4). More specifically, Elson asserts that because the "property" taken from the victims was judgments, the victims have been made whole by McPeak's return of the judgments. The government interprets Elson's argument as asserting that the restitution order permits "double recovery," and responds by noting that "there has been no recovery by the victims resulting from McPeak's agreement to transfer the civil judgments to the government." (Gov't Br. 46-47.)

Neither the record nor the parties' briefs disclose which judgments McPeak returned. Elson cites only to the district court's restitution opinion which notes that the court approved McPeak's agreement with the government pursuant to which McPeak would satisfy his restitution obligation by turning over to the government "[c]ertain judgments against Schultz which the [g]overnment estimates to be worth between $6 [million] and $10 [million]." (J.A. 150 n.4.) Significantly, Elson does not argue that the judgments McPeak delivered to the government include the judgments previously held by the victims at issue here—Bourke and St. Paul.

As with the attorney-fee claim, if St. Paul and Bourke have received compensation for their losses, the district court should offset the restitution obligation by the amount received, assuming that the compensation is for the same loss that is the subject of the restitution obligation. *E.g.*, *United States v. Crawford*, 169 F.3d 590, 593 (9th Cir. 1999). Here, even though McPeak has returned the judgments, the victims who sold the judgments remain uncompensated for the loss—the difference between the judgment's value and the amount that they received in exchange for the judgment—caused by the Schultz conspiracy. Under the applicable statutory provisions, a victim must have "received compensation" for a court to consider the offset allowance provided in § 3664(j)(1). Further, Elson has not met his burden of showing that the

government has collected on the returned judgments and distributed the proceeds to the victims.  Accordingly, § 3664(j)(2), which provides that the restitution amount "shall be reduced by any amount later recovered as compensatory damages for the same loss" does not apply.  Because "funds the victims have *not* received cannot reduce or offset the amount of losses the defendant is required to repay," *Bright*, 353 F.3d at 1123, the district court lacked authority to reduce Elson's restitution obligation by the value of the judgments returned.

Elson further argues that, because McPeak's restitution obligation was deemed satisfied by McPeak's return of certain judgments, his obligation also should be discharged "since Elson and McPeak functioned together in the conspiracy." (Def.'s Br. 11.) However, McPeak entered into a specific agreement with the government regarding restitution prior to the district court's entry of the restitution order.  Thus, as the district court noted in its restitution order, "the findings in th[e] order [relating to Elson's restitution] do not pertain to [McPeak]," and McPeak was not ordered to pay restitution jointly and severally with Elson and the other co-defendants. (J.A. 150 n.6.)  Moreover, Elson has not provided any details regarding the agreement between McPeak and the government, nor has he offered any reason to believe that McPeak's payment of his restitution obligation through the return of judgments should discharge Elson's obligation to pay restitution to the victims of the conspiracy.  Accordingly, we conclude that Elson is not entitled to an offset of his restitution obligation.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment ordering Elson to pay restitution.